FILED

12 JUN -8 PM 1:30

CLERK   U.S. DISTRICT COURT
CENT... ...T OF CALIF.
LOS ANGELES

BY:_____

1  JOHN B. SULLIVAN (State Bar No. 96742)
   jbs@severson.com
2  REBECCA S. SAELAO (State Bar No. 222731)
   rss@severson.com
3  SEVERSON & WERSON
   A Professional Corporation
4  One Embarcadero Center, Suite 2600
   San Francisco, California 94111
5  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
6
7  Attorneys for Defendants ALLY BANK,
   ALLY FINANCIAL INC., and GMAC
   MORTGAGE GROUP LLC
8

9              UNITED STATES DISTRICT COURT

10    CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

11

12  CAROLYN HAIRSTON, , an individual;     Case No.: CV12-05016 JAK(AGRx)
    CHRISTINE PETERSEN, an individual;
13  WILLIAM MIMIAGA, an individual;        **NOTICE OF REMOVAL**
    ROBIN GASTON, an individual;
14  PATRICK GASTON, an individual;         28 U.S.C. §§ 1331, 1332, 1337, 1441(b)
    MARY SERRANO, an individual;
15  SARAH SEBAGH, an individual; RICK
    ALBRITTON, an individual;              [Removal from Superior Court of
16  DEBORAH ALBRITTON, an                  California for the County of Los
    individual; VERONICA GREY, an          Angeles, Case No. BC 484385]
17  individual; BRENDA MELLA, an
    individual; JOSELITO MELLA, an         Complaint filed May 9, 2012
18  individual; MICHAEL MAN, an
    individual; JUDY LIM, an individual;
19  DAVID CRUZ, an individual; YESENIA
    CRUZ, an individual; GREGORY
20  BUCK, an individual; CRISTINA
    PALBICKE, an individual; KHALIL
21  SUBAT, an individual; MANIJA
    SUBAT, an individual; GENEVIE
22  CABANG, an individual; JULIO
    GONZALEZ, an individual; LISA A.
23  SIMONYI, an individual; RICK
    EWALD, an individual; REGINA
24  FAISON, an individual; ALEX
    IBARRA, an individual; MARIA
25  ELENA DEL CID, an individual; JULIO
    DEL CID; MESBEL MOHAMOUD, an
26  individual; MICHAEL MOULTRIE, an
    individual; WILLIE GILMORE, an
27  individual; PHYLLIS MCCREA, an
    individual; CECILIA CHAUBE, an
28  individual; MAGDALENA AVILA;

2225490

NOTICE OF REMOVAL

1  GRICELDA RUANO, an individual;
ELISA JORDAN, an individual; LOIS
2  TERRELL SULLIVAN, an individual;
GLORIA PORTILLO, an individual;
3  FLORASTENE HOLDEN, an
individual; MARCO BADILLA, an
4  individual; MANUELA BADILLA, an
individual,
5
           Plaintiffs,
6
      vs.
7
   ALLY BANK, N.A., f/k/a GMAC
8  BANK, a Utah Corporation, in its own
capacity and as an acquirer of certain
9  assets and liabilities of GMAC; GMAC,
a National Banking Association; ALLY
10 FINANCIAL, INC. f/k/a GMAC, LLC, a
Delaware Corporation; GMAC
11 MORTGAGE GROUP, INC., a
Delaware Corporation; RESIDENTIAL
12 CAPITAL, LLC f/k/a RESIDENTIAL
CAPITAL CORPORATION, a Delaware
13 Corporation; GMAC-RFC HOLDING
COMPANY, LLC, d/b/a GMAC
14 RESIDENTIAL FUNDING
CORPORATION, a Delaware
15 Corporation; RESIDENTIAL FUNDING
COMPANY, LLC f/k/a RESIDENTIAL
16 FUNDING CORPORATION, a
Delaware Corporation;
17 HOMECOMINGS FINANCIAL, LLC, a
Delaware Corporation; EXECUTIVE
18 TRUSTEE SERVICES DBA ETS
SERVICES, LLC, a Delaware limited
19 liability company; HOME CONNECTS
LENDING SERVICES, LLC, a
20 Pennsylvania limited liability company,
and Does 1 through 1000, inclusive,
21
           Defendants.
22

23

24 **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

25      PLEASE TAKE NOTICE that defendants Ally Financial Inc. ("Ally"), Ally

26 Bank (incorrectly named as Ally Bank, N.A.), and GMAC Mortgage Group LLC

27 (incorrectly named as GMAC Mortgage Group, Inc.) ("removing defendants")

28 hereby remove to this Court the state court action described below:

2225490                                1

**The Removed Action**

1.      On May 9, 2012, plaintiffs commenced this action, entitled *Carolyn Hairston*, et al. *v. Ally Bank, N.A.*, et al., No. BC484385, in the Superior Court of the State of California for Los Angeles County (the "State Court Action").

2.      Plaintiffs assert the following claims in the State Court Action: (1) fraudulent concealment (violation of Cal. Civ. Code §§ 1572, 1709 and 1710); (2) intentional misrepresentation (violation of Cal. Civ. Code §§ 1572, 1709 and 1710); (3) negligent misrepresentation (violation of Cal. Civ. Code §§ 1572, 1709 and 1710); (4) unfair competition (violation of Cal. Bus. & Prof. Code § 17200 *et seq.*); (5) wrongful foreclosure (violation of Cal. Civ. Code § 2924); (6) violation of the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; and (7)-(8) violation of appraisal independence (12 U.S.C. § 1640 *et seq* and 12 C.F.R. § 225.65).

3.      Defendants Ally Bank and GMAC Mortgage Group LLC first received a copy of the complaint in this action on May 10, 2012.  On information and belief, all other defendants first received a copy of the complaint on May 11, 2012, with the exception of Home Connects Lending Services, LLC, who received a copy on May 14, 2012.[1]  On information and belief, none of the defendants sued by fictitious name, Does 1 through 1000, have been served.

4.      As required by 28 U.S.C. § 1446(a), attached as Exhibit A are true and correct copies of the complaint, the summons, the Civil Case Cover Sheet and Civil Case Cover Sheet Addendum and Statement of Location, along with other pleadings

---

[1] On May 11, 2012, plaintiffs filed a proof of service purporting to have served "GMAC, a National Banking Association" ("GMAC N.A.") on May 10, 2012. While the complaint caption lists GMAC N.A. as a defendant, the complaint itself fails to describe this entity or include allegations against it. (*See* Complaint, May 10, 2012 ("Compl."), at ¶¶ 8-18.) In any event, no such entity exists. Defendant Ally Bank was formerly known as GMAC Bank.  Defendant Ally was formerly known as GMAC Inc.  Neither is a national banking association.  The non-existent entity can have no bearing on this Court's jurisdiction and should be disregarded.

1 | available from the state court's files, which constitute all process, pleadings and
2 | orders in the action, to the best of defendants' knowledge.

3 | **Defendants' Consent to Removal and Status of Rescap Defendants**

4 |         5.      In addition to the removing defendants and 1000 Does, the complaint
5 | names as defendants Residential Capital, LLC, Residential Capital Corporation,
6 | GMAC-RFC Holding Company, LLC, Residential Funding Corporation,
7 | Homecomings Financial, LLC, Executive Trustee Services, LLC, and Home
8 | Connects Lending Services, LLC (collectively, "Rescap defendants").  (Compl., ¶¶
9 | 8-16.)  On May 14, 2012, these entities filed voluntary petitions under Chapter 11 of
10 | the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern
11 | District of New York.

12 |         6.      No defendants object to removal.  The Rescap defendants consent to
13 | removal, except to the extent their consent may be precluded by 11 U.S.C.
14 | § 362(a)(1) and the effect of the automatic stay accompanying their bankruptcy
15 | filing.  In any event, the Rescap defendants are nominal defendants whose consent is
16 | not required for removal to be proper and effective here.  *See, e.g., PNC Equip. Fin.,*
17 | *LLC v. USA Wheel Tech., Inc.,* No. 11-199, 2012 WL 441172, at *2 (S.D. Ohio
18 | Feb. 10, 2012) (Bankruptcy debtor defendants are merely "formal or nominal"
19 | parties who, as "defendant[s] subject to the automatic stay [are] 'not properly
20 | joined,' " and as such are an exception to the rule of unanimity whose consent to
21 | removal is not required) (citations omitted); *Caranchini v. Bank of America, N.A.,*
22 | No. 4:10-CV-672-DGK, 2010 WL 3782171, at *3 (W.D. Mo., Sept. 22, 2010) ("The
23 | remaining Defendants have either not been served or are in bankruptcy, so the Court
24 | ignores them for purposes of determining whether all Defendants consent to removal
25 | . . . ."); *Wallis v. So. Silo Co., Inc.,* 369 F.Supp. 9, 96 (N.D. Miss. 1973) (Bankrupt
26 | was not required to join in the other defendant's motion for removal of the action to
27 | federal court in order for the action to be properly removed.); *see also United*
28 | *Computer Sys., Inc. v. AT&T Corp.,* 298 F.3d 756, 762 (9th Cir. 2002) ("nominal,

1  unknown or fraudulently joined parties" need not consent for removal to be proper)

2  (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988)).

3  **Venue**

4       7.    Removal to this district court is proper because this is the district which

5  embraces the county in which plaintiff filed the State Court Action.  28 U.S.C.

6  § 1441(a).

7  **Removal Based On Federal Question Jurisdiction**

8       8.    Defendants are entitled to remove the State Court Action on the ground

9  that this Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1331 as

10  plaintiff brings causes of action for alleged violation of multiple federal statutes and

11  regulations.  *See* 15 U.S.C. § 1640(e); 28 U.S.C. §§ 1331, 1337, 1441(b).  The

12  federal statutes and regulations that plaintiffs allege defendants violated include: the

13  Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA") (Compl. ¶¶ 407, 447-458);

14  15 U.S.C. § 1639e (Compl. ¶¶ 409, 464) (alleging violations of "appraisal

15  independence"); and 12 C.F.R. § 225.65 (Compl. ¶¶ 410, 465-471) (alleging

16  violation of federal regulations governing "appraisal independence").

17       9.    Indeed, plaintiff alleges that "*jurisdiction . . . is invoked pursuant to . . . .*

18  *15 U.S.C. § 1640 and 28 U.S.C. § 1331 and 1337*" (Compl. ¶ 448 (emphasis added)).

19  In addition to invoking TILA and federal question jurisdiction, plaintiff alleges

20  violation of other federal laws, including: the Fair Credit Reporting Act, 15 U.S.C.

21  §§ 1681 *et seq.* (Compl. ¶ 401); the Securities Act of 1933 and the Securities

22  Exchange Act of 1935, 15 U.S.C. §§ 77q(a), 78j(b), and 78t, and regulations

23  thereunder (Compl. ¶ 403); the USA Patriot Act, Title III, §§ 212, 213, 219, 302,

24  312, 325 and 326, and 31 U.S.C. § 5318(1)(2)(A)-(B) (Compl. ¶¶ 258-272, 404-407);

25  and the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.* (Compl. ¶ 418).

26       10.    Defendants are thus entitled to remove this action pursuant to federal

27  question jurisdiction.  *See* 15 U.S.C. § 1640(e); 28 U.S.C. §§ 1331, 1337, 1441(b).

28

**Removal Based On Diversity Jurisdiction**

11.    Defendants are also entitled to remove the State Court Action on the ground that this Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states and involves an amount in controversy which exceeds the sum or value of $75,000, exclusive of costs and interest.  Defendants may thus remove this action pursuant to 21 U.S.C. §§ 1332 and 1441(a).

(a)    **Amount in Controversy.**  Plaintiffs assert that "[b]ased on information now available to them, fewer than 100 plaintiffs are alleging claims in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332 (a)."  (Compl. ¶ 38.)  It is unclear whether by this statement plaintiffs are conceding or contesting that each of the 41 plaintiffs' individual claims meet the statutory amount in controversy threshold of $75,000.  Regardless, from the face of the complaint, plaintiffs allege claims on behalf of each individual plaintiff that, exclusive of interest and costs, exceed the amount in controversy threshold, as set forth below:

(i) **Alleged damage to property values.**  Plaintiffs allege that "Defendants' scheme has materially depressed the price of real estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the Plaintiffs."  (*Id.* ¶ 321.)  Plaintiffs claim that as a result of defendants' actions, "California property values have *precipitously declined* . . . gravely damaging Plaintiffs by materially reducing the value of their primary residences . . . ."  (*Id.* ¶ 322 (emphasis added).)  Plaintiffs further allege that they suffered damage in the form of "*some or all of the benefits appurtenant to the ownership and possession of real property.*"  (*Id.* ¶ 427 (emphasis added).)  Taken together with plaintiffs' other alleged damages, plaintiffs' allegations of decreased property values put the amount in controversy at in excess of $75,000 per plaintiff.

(ii)    **Alleged payments exceeding property values.**  Plaintiffs allege that in "numerous instances" they made *"payments in excess of the value of their properties . . . ."* (*Id.* ¶ 322 (emphasis added).)  Each of the properties at issue has a value in excess of $75,000, and the amount in controversy requirement is thus met.

(iii)    **Alleged inflated down payments.**  Plaintiffs allege that they were "required to place larger down payments" than necessary, due to inflated appraisals, and that "damages" for the inflated down payments would be calculated as "Damages = %Down Payment x (Inflated Value of Home – True Value of Home at the time)." (*Id.* ¶ 323.)  Plaintiffs further allege that "[f]or instance, a borrower who was required to put 20% down on a home whose true value was $600,000 but whose appraisal was artificially inflated to $800,000, suffered an additional $40,000 in damages [D = 20% x (800,000 – 600,000)]." (*Id.*)  Taken together with plaintiffs' other alleged damages, plaintiffs' allegations of damages due to inflated down payments put the amount in controversy at in excess of $75,000 per plaintiff.

(iv)    **Alleged entitlement to refunds.**  Plaintiffs allege that they are "entitled to remuneration of all payments made under . . . trial payment plans . . . ." (*Id.* ¶ 397.)  Plaintiffs further allege that they "are entitled to restitution of all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments . . . fees . . .and premiums[.]" (*Id.* ¶ 429.)  Taken together with plaintiffs' other alleged damages, plaintiffs' allegations of entitlement to refunds put the amount in controversy at in excess of $75,000 per plaintiff.

(v)    **Other alleged damages.**  Plaintiffs allege that "Defendants took from Plaintiffs and other borrowers *billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits . . . ."* (*Id.* ¶ 102 (emphasis added).)  Plaintiffs further allege that their damages "include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced

2225490

6

1   availability of goods and services tied to credit ratings, increased costs of those

2   services, as well as fees and costs, including without limitation, attorneys' fees and

3   costs." (*Id.*¶¶ 324, 387.)  Indeed, plaintiffs allege that defendants "collaborated . . .

4   to suck every last bit of equity out of the plaintiffs' homes." (*Id.* ¶ 128.)  Plaintiffs'

5   claims thus put the amount in controversy at in excess of $75,000 per plaintiff.

6              (vi)   **Alleged wrongful foreclosure.**  Five plaintiffs, Rick and Deborah

7   Albritton, David and Yesenia Cruz, and Cristina Palbicke, bring claims for wrongful

8   foreclosure and seek exemplary and punitive damages as well as injunctive relief.

9   (*Id.* ¶¶ 434-446; Prayer for Relief at 5.)  Taken with plaintiffs' other allegations of

10  damage, these allegations put the amount in controversy at in excess of $75,000 per

11  plaintiff for these individuals. *See, e.g., Cohn v. Pet-smart, Inc.*, 281 F.3d 837, 840

12  (9th Cir. 2002) (In an action seeking declaratory relief, the amount in controversy is

13  measured by the value of the object of the litigation.).

14             (vii)  **Prayer for Relief.**  In their prayer for relief, all plaintiffs seek

15  "General, Actual, Compensatory, Special and Exemplary damages," "[t]wice the

16  amount of finance charges," statutory relief, restitution, and injunctive relief.

17  (Compl. Prayer for Relief.)  Plaintiffs' prayer thus puts the amount in controversy at

18  in excess of $75,000 per plaintiff.  *See, e.g., Cohn*, 281 F.3d at 840.

19       (b)   **Complete Diversity of Citizenship:**

20             (i)    *Plaintiff's Citizenship.*  Plaintiffs are citizens of California.  (*See*

21  *e.g.*, Compl., ¶ 38 (alleging plaintiffs are "individuals residing in the State of

22  California.").)

23             (ii)   *Defendants' Citizenship.*  All of the defendants are diverse from

24  plaintiffs:

25       *Ally Bank.*  Ally Bank is not a citizen of California.  Ally Bank is a Utah

26  industrial bank, formed under and in accordance with the laws of the State of Utah.

27  Ally Bank's principal place of business is in Midvale, Utah.  Ally Bank is thus a

28  citizen of Utah for diversity purposes, and is not a citizen of California.

1     *Ally.*  Ally is not a citizen of California.  Ally is a Delaware corporation with

2     its principal place of business in Detroit, Michigan, where Ally's corporate

3     headquarters and "nerve center" are located.  *See Hertz Corp. v. Friend*, 130 S.Ct.

4     1181, 1192-93 (2010).  Hence, Ally is a citizen of Delaware and Michigan for

5     diversity purposes.

6         *GMAC Mortgage Group LLC.*  GMAC Mortgage Group LLC is not a citizen

7     of California.  It is a Delaware limited liability whose sole owner and member is

8     Ally.  Like its member Ally, GMAC Mortgage Group LLC is thus a citizen of

9     Michigan and Delaware for diversity purposes.  *See Johnson v. Columbia Props.*

10    *Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (For purposes of diversity

11    jurisdiction, a limited liability corporation is a citizen of all states where its members

12    are citizens).

13        (iii)    *Rescap Defendants.*  The citizenship of the Rescap defendants, as

14    bankruptcy debtors and thus nominal parties, may be disregarded for purposes of

15    determining diversity jurisdiction.  *See Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1183

16    (9th Cir. 2004) ( "[A] federal court must disregard nominal or formal parties and rest

17    jurisdiction only upon the citizenship of real parties to the controversy.") (citing

18    *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 46 (1980)); *see also PNC Equip. Fin., LLC*,

19    2012 WL 441172, at *2 (Bankruptcy debtor defendants are merely "formal or

20    nominal" parties) (citations omitted).  In any event, none of the Rescap defendants

21    are citizens of California.  Instead, each of these defendants is a limited liability

22    company whose members are citizens of Michigan and Delaware for diversity

23    purposes.  Like their members, each of the Rescap defendants is thus a citizen of

24    Michigan and Delaware for diversity purposes.  Specifically:

25        *Residential Capital, LLC.*  Residential Capital, LLC is not a citizen of

26    California.  It is a Delaware limited liability company whose only owners and

27    members are GMAC Mortgage Group, LLC and ResCap Investments, LLC.  The

28    sole owner and member of ResCap Investments, LLC is GMAC Mortgage Group,

2225490

8

1    LLC, a citizen of Michigan and Delaware, as set forth above.  Like its member,

2    ResCap Investments, LLC is a Delaware limited liability companies and a citizen of

3    Michigan and Delaware.  Like its members, Residential Capital, LLC is thus a

4    citizen of Michigan and Delaware for diversity purposes.

5         *GMAC-RFC Holding Company, LLC*.  GMAC-RFC Holding Company, LLC

6    is not a citizen of California.  It is a Delaware limited liability company whose sole

7    owner and member is Residential Capital, LLC, a citizen of Michigan and Delaware,

8    as set forth above.  Like its member, GMAC-RFC Holding Company, LLC is a

9    citizen of Michigan and Delaware for diversity purposes.

10        *Residential Funding Company, LLC*.  Residential Funding Company, LLC is

11   not a citizen of California.  It is a Delaware limited liability company whose sole

12   owner and member is GMAC-RFC Holding Company, LLC, a citizen of Michigan

13   and Delaware, as set forth above.  Like its member, Residential Funding Company,

14   LLC is a citizen of Michigan and Delaware for diversity purposes.

15        *Homecomings Financial, LLC*.  Homecomings Financial, LLC is not a citizen

16   of California.  It is a Delaware limited liability company whose sole owner and

17   member is Residential Funding Company, LLC, a citizen of Michigan and Delaware,

18   as set forth above.  Like its member, Homecomings Financial, LLC is a citizen of

19   Michigan and Delaware for diversity purposes.

20        *Executive Trustee Services, LLC* ("ETS").  ETS is not a citizen of California.

21   It is a Delaware limited liability company whose sole owner and member is GMAC

22   Mortgage, LLC, a Delaware limited liability company whose sole owner and

23   member in turn is GMAC Residential Holding Company, LLC, a Delaware limited

24   liability company whose sole owner and member in turn is Residential Capital, LLC,

25   a citizen of Michigan and Delaware, as set forth above.  Like its member, ETS is a

26   citizen of Michigan and Delaware for diversity purposes.

27        *Home Connects Lending Services, LLC* ("Home Connects").  Home Connects

28   is not a citizen of California.  It is a Pennsylvania limited liability whose sole owner

1   and member is GMACRH Settlement Services, LLC, a Delaware limited liability

2   company whose sole owner and member in turn is GMAC Residential Holding

3   Company, LLC, a Delaware limited liability company whose sole owner and member

4   in turn is Residential Capital, LLC, a citizen of Michigan and Delaware, as set forth

5   above.  Like its member, Home Connects is a citizen of Michigan and Delaware for

6   diversity purposes.

7       (iv) The citizenship of Does 1 through 1000 is disregarded pursuant to

8   28 U.S.C. § 1441(a).

9      **Timeliness of Removal**

10     12. This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b).

11   Plaintiffs served their complaint on defendants Ally Bank and GMAC Mortgage

12   Group LLC on or about May 10, 2012.  The 30-day deadline for these first-served

13   defendants to file a notice of removal falls on June, 9, 2012, a Saturday.  Hence,

14   under Federal Rule of Civil Procedure 6(a)(1)(C), the deadline for these defendants to

15   file a notice of removal would be the following Monday, June 11, 2012.  This notice,

16   filed on or in advance of that date, is thus timely.

17      **Notice to Plaintiff and Superior Court**

18     13. As required by 28 U.S.C. § 1446(d), defendants will provide written

19   notice of the removal of this action to plaintiff and to the Superior Court of Los

20   Angeles County.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

2225490

10

14.     WHEREFORE, defendants pray that the State Court Action be removed from state court to this Court, that this Court assume jurisdiction over the action and determine it on the merits.

DATED:  June 8, 2012                  SEVERSON & WERSON
                                      A Professional Corporation


                                By:   _____
                                          Rebecca S. Saelao
                                Attorneys for Defendants ALLY BANK, ALLY
                                FINANCIAL INC., and GMAC MORTGAGE
                                GROUP LLC

2225490

11

NOTICE OF REMOVAL

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Vito Torchia, Jr. (SBN 244687) Deron M. Colby (SBN 196686)
BROOKSTONE LAW, PC
4000 MacArthur Blvd., Ste. 1110
Newport Beach, CA 92660
TELEPHONE NO.: 800-946-8655 FAX NO.: 866-257-6172
ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 09 2012

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
DOROTHY SWAIN

CASE NAME:
Hairston v. Ally Bank

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC484385 |
|---|---|---|
| ☑ Unlimited ☐ Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | ☐ Counter ☑ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☑ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4. Number of causes of action (specify): Eight (8); Fraud, Misrepresentation; Unfair Competition; etc.
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 5/8/2012
Vito Torchia, Jr.
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use / Judicial Council of California / CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

EXHIBIT A
001

Ex. A

| SHORT TITLE: Hairston v. Ally Bank | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

BY FAX

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 10-20 ☐ HOURS/ ☑ DAYS

**Item II.** Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons –<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

## CIVIL CASE COVER SHEET ADDENDUM
## AND STATEMENT OF LOCATION

Local Rule 2.0
Page 1 of 4

| SHORT TITLE:  Hairston v. Ally Bank | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation         Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

| SHORT TITLE: Hairston v. Ally Bank | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☑ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

EXHIBIT A
004

| SHORT TITLE: Hairston v. Ally Bank | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case. | ADDRESS: 1534-36 Hauser Blvd. |
|---|---|
| ☑1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☑8. ☐9. ☐10. | |

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90019 | |
|---|---|---|---|

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the _Stanley Mosk_ courthouse in the _Central_ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: 5/8/2012

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

EXHIBIT A
005

**SUMMONS**
*(CITACION JUDICIAL)*

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SUM-100
*(SOLO PARA USO DE LA CORTE)*

MAY 09 2012

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
DOROTHY SWAIN

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ALLY BANK, N.A., f/k/a GMAC BANK, a Utah Corporation,
(Please see attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CAROLYN HAIRSTON, an individual;
(Please see attachment)

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse<br><br>111 North Hill St., Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>BC484385 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Brookstone Law, PC 4000 MacArthur Blvd., Ste. 1110, Newport Beach, CA 92260 · · · 800-946-8655.

| | | | |
|---|---|---|---|
| DATE: MAY 09 2012<br>*(Fecha)* | Clerk, by<br>*(Secretario)* | D.M. | , Deputy<br>*(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* GMAC, a National Banking association

   under: ☑ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Hairston v. Ally Bank | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

| ✓ Plaintiff | ☐ Defendant | ☐ Cross-Complainant | ☐ Cross-Defendant |
|---|---|---|---|

CHRISTINE PETERSEN, an individual; WILLIAM MIMIAGA, an individual; ROBIN GASTON, an individual; PATRICK GASTON, an individual; MARY SERRANO, an individual; SARAH SEBAGH, an individual; RICK ALBRITTON, an individual; DEBORAH ALBRITTON, an individual; VERONICA GREY, an individual; BRENDA MELLA, an individual; JOSELITO MELLA, an individual; MICHAEL MAN, an individual; JUDY LIM, , an individual; DAVID CRUZ, an individual; YESENIA CRUZ, an individual; GREGORY BUCK, an individual; CRISTINA PALBICKE, an individual; KHALIL SUBAT , an individual; MANIJA SUBAT, an individual; GENEVIE CABANG, an individual; JULIO GONZALEZ, an individual; LISA A. SIMONYI , an individual; RICK EWALD, an individual; REGINA FAISON, an individual; ALEX IBARRA, an individual; MARIA ELENA DEL CID, an individual; JULIO DEL CID, an individual; MESBEL MOHAMOUD, an individual; MICHAEL MOULTRIE, an individual; WILLIE GILMORE, an individual; PHYLLIS MCCREA, an individual; CECILIA CHAUBE, an individual; MAGDALENA AVILA, an individual; GRICELDA RUANO, an individual; ELISA JORDAN, an individual; LOIS TERRELL SULLIVAN, an individual; GLORIA PORTILLO, an individual; FLORASTENE HOLDEN, an individual; MARCO BADILLA, an individual; MANUELA BADILLA, an individual

Page __1__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Hairston v. Ally Bank | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

in its own capacity and as an acquirer of certain assets and liabilities of GMAC, GMAC, a National Banking Association, ALLY FINANCIAL, INC. f/k/a/ GMAC, LLC, a Delaware Corporation; GMAC MORTGAGE GROUP, INC., A Delaware Corporation; RESIDENTITAL CAPITAL, LLC f/k/a RESIDENTIAL CAPITAL CORPORATION, a Delaware Corporation; GMAC-RFC HOLDING COMPANY, LLC d/b/a/ GMAC RESIDENTIAL FUNDING CORPORATION, A Delaware Corporation; RESIDENTIAL FUNDING COMPANY, LLC f/k/a RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; HOMECOMINGS FINANCIAL, LLC, a Delaware Corporation; EXECUTIVE TRUSTEE SERVICES DBA ETS SERVICES ,LLC, a Delaware limited liability company; HOME CONNECTS LENDING SERVICES, LLC, a Pennsylvania limited liability company and Does 1 through 1000 , inclusive

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 09 2012

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
DOROTHY SWAIN

1   Vito Torchia, Jr. (SBN244687)
    vjt@brookstonelaw.com
2   Deron M. Colby (SBN 196686)
    dcolby@brookstonelaw.com
3   Sasan Behnood (SBN 250626)
    sbehnood@brookstonelaw.com
4   BROOKSTONE LAW, PC
    4000 MacArthur Blvd., Suite 1110
5   Newport Beach, California 92660
    Telephone: (800) 946-8655
6   Facsimile: (866) 257-6172
    E-mail: HairstonvAlly@BrookstoneLaw.com
7
8   Attorneys for Plaintiffs

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                       COUNTY OF LOS ANGELES

12                                      BC484385

13  CAROLYN HAIRSTON, an individual;      Case No.:
    CHRISTINE PETERSEN, an individual;
14  WILLIAM MIMIAGA, an individual;       COMPLAINT FOR:
    ROBIN GASTON, an individual;
15   PATRICK GASTON, an individual;       1.  FRAUDULENT CONCEALMENT
    MARY SERRANO, an individual;              [VIOLATION OF CIV. CODE §§ 1572,
16  SARAH SEBAGH, an individual;              1709 AND 1710];
    RICK ALBRITTON, an individual;
17  DEBORAH ALBRITTON, an individual;     2.  INTENTIONAL MISREPRESENTATION
    VERONICA GREY, an individual;             [VIOLATION OF CIV. CODE §§ 1572,
18  BRENDA MELLA, an individual;              1709 AND 1710];
    JOSELITO MELLA, an individual;
19  MICHAEL MAN, an individual;          3.  NEGLIGENT MISREPRESENTATION
    JUDY LIM, , an individual;               [VIOLATION OF CIV. CODE §§ 1572,
20  DAVID CRUZ, an individual;               1709 AND 1710];
    YESENIA CRUZ, an individual;
21  GREGORY  BUCK, an individual;        4.  UNFAIR COMPETITION [VIOLATION
    CRISTINA PALBICKE, an individual;        OF BUS. & PROF. CODE §17200 ET
22  KHALIL  SUBAT , an individual;           SEQ.];
    MANIJA SUBAT, an individual;
23  GENEVIE CABANG, an individual;       5.  WRONGFUL FORECLOSURE
    JULIO GONZALEZ, an individual;           [VIOLATION OF CIV CODE § 2924];
24  LISA A. SIMONYI , an individual;
    RICK EWALD, an individual;           6.  VIOLATION OF TRUTH IN LENDING
25                                           ACT, 15 USC §1601 et seq.
26                                       7.  VIOLATION OF APPRAISAL
                                             INDEPENDENCE
27                                           [Violation of 12 U.S.C. §1640 et seq.]

                              - 1 -
28  _____
                          COMPLAINT

1  REGINA  FAISON, an individual;
   ALEX IBARRA, an individual;
2  MARIA ELENA DEL CID, an individual;
   JULIO DEL CID, an individual;
3  MESBEL  MOHAMOUD, an individual;
   MICHAEL  MOULTRIE, an individual;
4  WILLIE  GILMORE, an individual;
5  PHYLLIS MCCREA, an individual;
   CECILIA CHAUBE, an individual;
6  MAGDALENA   AVILA, an individual;
7  GRICELDA  RUANO, an individual;
   ELISA JORDAN, an individual;
8  LOIS TERRELL SULLIVAN, an
   individual;
9  GLORIA  PORTILLO, an individual;
10 FLORASTENE HOLDEN, an individual;
   MARCO BADILLA, an individual;
11 MANUELA BADILLA, an individual;

12              Plaintiffs,

13
        vs.
14
15 ALLY BANK, N.A., f/k/a GMAC BANK, a Utah
   Corporation, in its own capacity and as an
16 acquirer of certain assets and liabilities of GMAC;
   GMAC, a National Banking Association; ALLY
17 FINANCIAL, INC. f/k/a/ GMAC, LLC, a
   Delaware Corporation; GMAC MORTGAGE
18 GROUP, INC., A Delaware Corporation;
19 RESIDENTITAL CAPITAL, LLC f/k/a
   RESIDENTIAL CAPITAL CORPORATION, a
20 Delaware Corporation; GMAC-RFC HOLDING
   COMPANY, LLC d/b/a/ GMAC RESIDENTIAL
21 FUNDING CORPORATION, A Delaware
22 Corporation; RESIDENTIAL FUNDING
   COMPANY, LLC f/k/a RESIDENTIAL
23 FUNDING CORPORATION, a Delaware
24 Corporation; HOMECOMINGS FINANCIAL,
   LLC, a Delaware Corporation; EXECUTIVE
25 TRUSTEE SERVICES DBA ETS SERVICES
   ,LLC, a Delaware limited liability company;
26 HOME CONNECTS LENDING SERVICES,
27 LLC, a Pennsylvania limited liability company

28

8.  **VIOLATION OF APPRAISER**
    **INDEPENDENCE**
    [Violation of 12 C.F.R. §225.65]

**[JURY TRIAL DEMANDED]**

- 2 -

**COMPLAINT**

1    and Does 1 through 1000 , inclusive

2              Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

**COMPLAINT**

EXHIBIT A
011

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ - 6 -

PARTIES ................................................................................................................... - 8 -

    Defendants ........................................................................................................... - 8 -

    Relationship Of Defendants ............................................................................... - 11 -

    Plaintiffs ............................................................................................................. - 15 -

BACKGROUND & HISTORY OF GMAC ................................................................ - 16 -

    A Mandate for Growth and More Profit – But At What Cost? ......................... - 18 -

ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN SYSTEMATIC FRAUD

    The Fraudulent Appraisal Process ..................................................................... - 29 -

    Defendants' Scheme to Fix the Market Through Their Wholly-Owned Appraisal Subsidiary: HCLS - 36 -

    Defendants Systematically Abused & Abandoned Their Underwriting Guidelines To Place Unqualified Borrowers Into Loans They Could Never Afford ........................... - 38 -

    Defendants Turned Substantial Profit Through Their Borrowers' Default – Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans .................... - 42 -

    Defendants' Liar Loans ...................................................................................... - 45 -

    Defendants Misled the Public – Including Plaintiffs ......................................... - 49 -

DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS ................................ - 52 -

    Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright Cash-Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own Fraud Discovered By Their Investors. - 52 -

    Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else .................................. - 54 -

    Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs ....................................................................... - 55 -

- 4 -

## COMPLAINT

DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER
WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS
OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT......- 56 -

    Defendants Seek to Enforce Notes & Deeds of Trust Without Evidencing Their Ownership Interest..-
57 -

    Defendants' Improper Securitization: ................................................................................- 58 -

    The Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under
The Explicit Terms Of Their Own Pooling & Service Agreements..........................................- 58 -

    Understanding MERS – And Its Role In Defendants' Wrongful Foreclosure Process....................- 63 -

    The Aftermath of Defendants' Wrongful Foreclosures.................................................- 65 -

DEFENDANTS' VIOLATION OF NUMEROUS OTHER LAWS ........................................- 67 -

    Defendants' Pervasive Scheme Of Fraud & Deception .................................................- 67 -

    The Patriot Act .............................................................................................- 70 -

    TILA / Notification of Sale or Transfer of Mortgage Loans..........................................- 72 -

    Previous Enforcement Actions Evidence Defendants' History Of The Very Wrongdoing Alleged
Herein – And Their Continued Wrongdoing In Violation Of Explicit Court Orders....................- 74 -

FIRST CAUSE OF ACTION ...............................................................................- 79 -

SECOND CAUSE OF ACTION ...........................................................................- 87 -

THIRD CAUSE OF ACTION ..............................................................................- 100 -

FOURTH CAUSE OF ACTION ...........................................................................- 102 -

FIFTH CAUSE OF ACTION ...............................................................................- 112 -

SIXTH CAUSE OF ACTION ..............................................................................- 114 -

SEVENTH CAUSE OF ACTION ..........................................................................- 117 -

EIGHTH CAUSE OF ACTION ............................................................................- 118 -

PRAYER FOR RELIEF .....................................................................................- 119 -

- 5 -

**COMPLAINT**

1

2   Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

3

4                              **NATURE OF ACTION**

5

6       1.     Defendant Banks have for the last decade taken the losses of others and used them for

7   their own private gain. That Defendants are in the business of making profit, and are entitled to do so is

8   not at issue. Nor is at issue that Defendants engage in an inherently lucrative business. But it is the

9   lengths to which Defendants have gone, to attain that profit, which is. It is where corporate lust for profit

10   leads corporations and banks to abandon common principles of fair business dealing so well-entrenched in the

11   human consciousness, that they need not even be announced by law, but are inherently apparent to all of

12   us, that the courts *must* intervene – that an example *must* be set. A line must be drawn putting

13   Corporations, Banks, and Defendants herein on notice that where their greed exceeds the extant public

14   need for informed disclosure in business dealings, the law will not sanction.

15       2.     With greed as their motive, Defendants set out upon a massive and centrally directed

16   fraud by which Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not

17   afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal

18   values of homes throughout California for the sole purpose of herding as many borrowers as they could

19   into the largest loans possible which Defendants would then sell on the secondary market at inflated

20   values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the

21   loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout*

22   *California*, including those of Plaintiffs herein.

23       3.     Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed.

24   Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and

25   whose default they knew was a mathematical certainty. Their fraudulent inflation of real estate values

26   throughout the State of California, the demise of which sent real estate values spiraling downwards,

27   caused Plaintiffs to be placed in homes that were immediately upside-down, and to instantly lose their

- 6 -

28

**COMPLAINT**

1 | equity – if not their homes altogether. And as a result of these two schemes coupled together, Borrowers

2 | were placed into loans far larger than would be supported by the true value of their property or their

3 | income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted

4 | excessive and unearned payments, points, fees, and interest from Plaintiffs. And as the final coup-de-

5 | grace, Defendants then intentionally steamrolled foreclosures upon those borrowers whose very peril

6 | was caused by Defendants' fraud in the first place, by charging grossly excessive "foreclosure fees' to

7 | line their pockets with ill-gotten profit.

8 |    4.  Simply put, Defendants let their greed get in the way of fair business. Where, as here,

9 | corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not

10 | sanction. This Court must recognize Defendants' duty to disclose.  Without such duties, Banks are

11 | effectively granted immunity for their continued future wrongs against the borrowing public who have a

12 | right to depend on the fundamental notion of good faith and fair dealing in contractual relationships. No

13 | business, particularly one as centrally-important to the American economy as banking, should be

14 | allowed to so egregiously deceive its consumers.  If Banks are to conduct business, their business *must*

15 | *not be* that of fraud and deception.

16 |    5.  It is admitted that this Complaint alleges great harm. But Defendants should not be

17 | granted immunity on the grounds that their fraudulent scheme, which envisioned far-reaching, sweeping

18 | and inarticulable harms, succeeded in achieving just that.

19 |    6.  It bears emphasizing – that the gravamen of the Complaint is not about the harm and

20 | frauds that Defendants have perpetrated on 3rd party investors, but rather the harms and frauds

21 | perpetrated upon Plaintiffs herein. The fraud described in the Complaint upon the investor, were merely

22 | the *incentive* for Defendants' fraud on Plaintiffs, and only one prong, in Defendants'  brazen,

23 | intertwined and multi-pronged fraudulent scheme.

24 |    7.  A fair reading of the Complaint, including reasonable inferences from the facts alleged

25 | therein, is that the concealment pertained *not only* to the commission of torts and crimes involving third

26 | parties, but also to, among other things: (1) the possession of internal reports concluding that if a

27 | Plaintiff took a loan from Defendants that Plaintiff would suffer material losses; (2) contrary to its

28 |

- 7 -

**COMPLAINT**

1    advertising and other broadly disseminated public statements, (i) Defendants had abandoned their

2    conventional lending business, appraisal, underwriting and lending standards and was now granting

3    credit as part of an overall unlawful scheme based on insider trading and other frauds that Defendants

4    knew and expected would gravely damage Defendants, the mortgage market and home values, and (ii)

5    Defendants now provided mortgages only for the purpose of immediately reselling the mortgage at an

6    inflated value and without regard to laws intended to protect consumers, such as the Truth in Lending

7    Act and Patriot Act; (3) Defendants' systematic and intentional inflation of Plaintiffs' property values in

8    order to approve them for loans which Defendants knew Plaintiffs were not qualified for and would to a

9    certainty default;  (4) undocumented domestic and foreign transfers of multiple interests in the loans and

10    sourcing of money for the loans, without complying with laws intended to protect consumers, including

11    the Patriot Act and Truth in Lending Act; and (5) the fact that Defendant had ceased acting as a

12    conventional money lender and had instead morphed into a fraudulent enterprise. Such information

13    would be highly material to a borrower's decision to enter into a contract with lenders/Defendants.

14

15    **PARTIES**

16

17    Defendants

18         8.      Defendant Ally Bank, Inc. ("Ally Bank") is a multi-national bank that became a bank

19    holding company in December 2008. The bank is headquartered in Detroit, Michigan and incorporated

20    in the State of Utah. The bank is based at 6895 Union Park Center, Midvale, Utah, and is FDIC insured.

21    Since August 2, 2004 it operated two main offices in the United States, one in Utah and one in

22    Pennsylvania, and has 616 employees as of June 2009. It also has a Canadian operation, simply called

23    Ally which operates under Resmor Trust Company, and which is Canadian Deposit Insurance

24    Corporation insured. Ally Bank is a direct bank that markets to customers offering mortgages, savings

25    products, certificates of deposit, online savings accounts, money market accounts and interest checking

26    accounts. Back office operations for Ally Bank and Ally Financial are located in Charlotte, North

27    Carolina. Ally Bank does business in the State of California.

28

- 8 -

**COMPLAINT**

1          9.     Defendant Ally Financial, Inc. ("Ally"), a leading, multi-national financial services firm

2  with a corporate office center in New York, has approximately $179 billion of assets and operations in

3  approximately 25 countries.  Ally is the parent and sole owner of Defendants GMAC Mortgage Group,

4  Inc. and Residential Funding Services, LLC. Prior to 2010, Ally was known as GMAC, LLC. Ally does

5  business in the State of California.

6          10.    Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly- owned subsidiary

7  and the mortgage arm of Ally. GMACM is a Delaware corporation with its principal place of business at

8  1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMACM transacted and is continuing to

9  do business in the State of California.

10         11.    Defendant Residential Capital, LLC ("ResCap") is a wholly-owned subsidiary of

11  GMACM and originates, services, and securitizes mortgage loan in the United States, including

12  California. ResCap was incorporated in the State of Delaware and its principal office is located at One

13  Meridian Crossings, Minneapolis, Minnesota 55423. Prior to 2007, ResCap was known as Residential

14  Capital Corporation. ResCap does business in the State of California.

15         12.    Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC Residential

16  Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential

17  mortgages and loans, which it then packages as mortgage –backed securities and sells to institutional

18  investors.  GMAC-RFC was incorporated in the State of Delaware and its principal office is located at

19  8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted business in

20  California.

21         13.    Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of

22  GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC was known as Residential

23  Funding Corporation. RFC was known as Sponsor of Securitization transactions which involve some of

24  the Plaintiffs in this complaint. Defendant RFC is the parent and sole owner of Homecomings Financial,

25  LLC ("HFN"), the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006,

26  HFN was known as Homecomings Financial Network, Inc. RFC does business in the State of California.

27

28

- 9 -

**COMPLAINT**

14.     Defendant Homecomings Financial, LLC ("HFN") is a wholly-owned subsidiary of RFC. HFN is a Delaware corporation and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. Prior to October 2006, HFN was known as Homecomings Financial Network, Inc. HFN is the originator of some of the Plaintiffs loans included in this complaint. HFN continues to do business in the State of California.

15.     Defendant Executive Trustee Services, LLC ("ETS") is a wholly-owned subsidiary of ALLY. ETS was and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles, and has intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. ETS is one of the Defendants' agents which acts as trustee under the deeds of trust securing real estate loans so as to foreclose on property securing the real estate loans held or serviced by the Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more fully described herein.

16.     Defendant Home Connects Lending Services, LLC ("HCLS") is a wholly –owned subsidiary of Ally. Home Connects Lending Services is a limited liability company organized and existing under the laws of the state of Pennsylvania, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles. Home Connects Lending Services, LLC is a settlement service provider for Ally and assigns and reviews all of Ally's appraisals.

17.     As used herein the term "ALLY DEFENDANTS" shall refer to all entities owned by Ally Financial. In other words the term "ALLY DEFENDANTS" shall refer to all Defendants in this action with the exception of MERS.

18.     As used herein the term "BANK DEFENDANTS" shall refer to all Defendants in this action which are all Defendants that have originated loans, namely, GMAC Bank aka Ally Bank,

- 10 -

**COMPLAINT**

1 | GMAC Mortgage, GMAC Residential Funding Corporation, Residentital Funding Corporation,

2 | Homecomings Financial, LLC.

3 |

4 | ***Relationship Of Defendants***

5 | 19.    At all times material hereto, the business of Defendants was operated through a common

6 | plan and scheme designed to conceal the material facts set forth herein from Plaintiffs, from the

7 | California public, and from regulators, either directly or as successors-in-interest to other Defendants.

8 | 20.    The concealment was completed, ratified and/or confirmed by each Defendant herein

9 | directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious

10 | acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out

11 | with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

12 | 21.    Plaintiffs believe and thereon allege that the agents and co-conspirators through which

13 | the named Defendants operated included, without limitation, financial institutions and other firms that

14 | originated loans on behalf of the Defendants.  These institutions acted at the behest and direction of the

15 | Defendants, or agreed to participate – knowingly or unknowingly - in the fraudulent scheme described

16 | herein.

17 | 22.    Those firms originating loans that knowingly participated in the scheme are jointly and

18 | severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and

19 | ratifying the wrongful acts of the knowing participants.  Upon learning the true name of such knowing

20 | participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as

21 | Doe Defendants.

22 | 23.    For avoidance of doubt, such knowing participants include, without limitation, legal and

23 | natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural

24 | persons owning directly or through affiliates financial interests in Defendants; legal and natural persons

25 | directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in

26 | the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree,

27 |

28 |

- 11 -

**COMPLAINT**

1  committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least

2  some degree, acting in concert with the Defendants.

3       24.    As to those legal and natural persons acting in concert without an express legal

4  relationship with Defendants or their affiliates, on information and belief, Defendants knowingly

5  induced and encouraged the parallel acts and omissions, created circumstances permitting and

6  authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior,

7  becoming jointly and severally liable therefore.

8       25.    As to those legal and natural persons whose acts and omissions in support of the

9  Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and

10  encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts

11  and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

12       26.    To the extent that certain Plaintiffs herein become aware of information that provides a

13  basis for asserting the Defendants herein are liable for the origination of their loans, those Plaintiffs

14  reserve the right to seek leave of this Court to re-assert the appropriate claims herein.

15       27.    The true names and capacities of the Defendants listed herein as DOES 1 through 1,000

16  are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the

17  DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby

18  participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is

19  responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon

20  learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint

21  accordingly.

22       28.    Plaintiffs are informed and believe, and thereon allege, that: (1) the Defendants are liable

23  for all wrongful acts of the companies which Ally acquired prior to the date thereof as the successor-in-

24  interest to those companies; (2) Ally directly and through its subsidiaries and other agents sued herein as

25  Does have continued the unlawful practices of the acquired companies since the dates of their

26  acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and

27

28

- 12 -

**COMPLAINT**

1  concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Ally and its subsidiaries
2  are jointly and severally liable as alter egos and as a single, greater unified whole.

3      29.    Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally
4  considers itself both a common enterprise operating as a greater whole and without meaningful
5  distinctions as to its operating units, and the successor to GMAC Mortgage, Homecomings, RFC and its
6  subsidiaries.

7      30.    More than 36 months before the filing of this Complaint, Ally completed the purchase of
8  the assets and operations and succeeded to the businesses of various mortgage lenders.  The assets of
9  these predecessor businesses purportedly included the loans made to Plaintiffs secured by their real
10 estate that are the subject of this action.  Ally can have no greater rights in the assets of these prior
11 businesses than their original owners had.  No transfer by any predecessor, on the one hand, to Ally, on
12 the other hand, actually or in fact involved any rights in or to mortgages against any of the properties of
13 Plaintiffs, for the reasons previously alleged.

14     31.    The other Defendants followed Ally's directions because they are or were either
15 subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are
16 in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are
17 thereby controlled and dominated by Ally.

18     32.    Executive Trustee Services ("ETS") involvement was an essential ingredient in
19 Defendants' conspiracy to defraud (and to commit the other acts alleged herein) in that it was through
20 ETS, the foreclosing trustee,  that Defendants were able to force wrongful foreclosures which
21 Defendants knew and intended would be unavoidable, and whose sales resulted in substantial additional
22 profit to Defendants resulting from their assessment of numerous fees associated with initiating or
23 conducting foreclosures including inspection fees, default fees, late fees, advance fees, attorney's fees,
24 and trustee fees. In short Defendants had a motive to wrongfully initiate foreclosures because they made
25 money by doing so through the assessment of excessive, disproportionate and unearned fees, and
26 because Defendants were insured against the losses arising from defaults. ETS was a necessary
27 instrument to make sure that the conspiracy of Defendants got to reap that profit.  In furtherance of

- 13 -

**COMPLAINT**

1    these acts ETS wrongfully initiated foreclosures forged recorded documents, executed assignments of

2    deeds of trust without the authority of the previous beneficiary, and effectuated numerous other

3    violations of California's non-judicial foreclosure laws, in order to steamroll foreclosures at the direction

4    of Ally Defendants, and for the benefit of the conspiracy. ETS also violated numerous other laws and

5    statutes in furtherance of this conspiracy.  ETS acted intentionally, and with malice in doing these acts,

6    for which ETS was paid by handsomely by Defendants.

7         33.     Defendant Home Connects Lending Services, LLC ("HCLS"), Ally's Appraisal

8    Management Company (AMC) was also a necessary and integral element of Defendants' conspiracy to

9    carry out their fraud. As the owner, Ally exercised its vast influence over HCLS to artificially inflate and

10   manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and

11   increase their profits, in furtherance of their overall conspiracy to defraud. Their purpose was twofold:

12             a.  First, by falsely inflating said property values, investors were defrauded into

13                 believing their investments in these loans were less risky than they actually were.

14                 This in turn led to more sales and even more profits on the secondary market.

15             b.  Second, Defendants would then turn around and use these false property valuations to

16                 induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly

17                 risky terms. The result was, again, more profits

18        34.     Hand-in-hand, and at the direction of the other Defendants, HCLS could carry out the

19   fraud without anyone ever finding out. If the appraisals were done by independent appraisers the

20   homeowners would have found out that the homes they were purchasing or refinancing were being over

21   valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The

22   customer never had a choice as to the settlement providers. Ally Defendants controlled and took the

23   choice out of the customer's hands and directed and collaborated with all their partners to systematically

24   inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of

25   their homes. In furtherance of this act they used the manipulated property valuations to seek premiums

26   on their loans to Plaintiffs, and Secondary Market transactions. Ally Defendants not only defrauded the

27

28

- 14 -

**COMPLAINT**

1 | Plaintiffs, but the rating agencies that graded the paper being sold, the insurance companies who

2 | assessed the risk of the loans being insured through loan to valuation risk models and their investors.

3 |       35.    Upon information and belief, though ETS's powers are limited to performing as a trust

4 | company, the Defendants, have regularly used ETS to foreclose, as trustee with power of sale, trust

5 | deeds on California realty and realty in other states.  Such foreclosures are commonly conducted non-

6 | judicially.  Such foreclosures result in the dispossession of debtors, including certain Plaintiffs herein,

7 | and also entail the assertion in certain instances of claims for the deficiency between amounts assertedly

8 | owed and the actual sale prices.  Such foreclosures are without authority.

9 |       36.    Upon information and belief, ETS is acting under the direct control of Ally Defendants

10 | and is an alter ego of Ally. ETS is personally responsible for robo-signing affidavits, executing

11 | assignments, and recording of Notice of Defaults and Trustee Sale Notices which are defective and not

12 | in accordance to California Law.

13 |       37.    This Complaint seeks significant relief from ETS since its conduct under the direction of

14 | Ally Defendant's and the key role that they played caused some Plaintiffs to lose their homes. Through a

15 | number of wrongful foreclosure actions they conspired with the other defendants to commit assorted

16 | violations of California's Unfair Competition Law. All of the violations done by this specific defendant

17 | were made in the State of California against California citizens.

18 |

19 | *Plaintiffs*

20 |       38.    All plaintiffs listed in the above caption are competent adults and individuals residing in the

21 | State of California, who borrowed money from one or more of the Defendants or its subsidiaries or affiliates

22 | or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on

23 | his or her California real estate(s).  At all material times hereto, one or more of the Defendants have acted as

24 | Servicer or some other control or capacity over processing the loan.

25 |       Based on information now available to them, fewer than 100 plaintiffs are alleging claims in amounts

26 | that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28

27 | U.S.C. § 1332(a).

- 15 -

**COMPLAINT**

EXHIBIT A
023

## BACKGROUND & HISTORY OF GMAC

39.     General Motors Corporation set up General Motors Acceptance Corporation (GMAC) to be a provider of financing to automotive customer's in 1919. GMAC branches opened in Detroit, New York, Chicago, San Francisco, and Toronto. Since then, the business has expanded to include insurance, online banking, mortgage operations, and commercial finance.

40.     Prior to 1985 GMAC's lending operations were concerned mostly with auto loans.

41.     In 1985, GMAC formed GMAC Mortgage after it acquired the mortgage loan operations of the Colonial Mortgage Service companies and the servicing arm of the former Norwest Mortgage, Inc. As part of the Norwest purchase, GMAC bought the rights to collect payments on the mortgage portfolio and make payments to investors who own the loans and pay taxes on the loans, collecting fees for the servicing. The portfolio was worth 11 billion at the time and consisted mostly of residential mortgages, though contained a small percentage of commercial mortgages.

42.     After GMAC saw its market share in the mortgage lending arena slip well below that of its competitors in the mid-1990s, GMAC made a conscious decision to up its participation in originations, securitizations and servicing of mortgage loans.

43.     In 1998 it purchased $131.24 billion worth of mortgage servicing rights from Wells Fargo and Capstead mortgage, which brought it back amongst the top ten mortgage lenders. This was part of a trend in the industry which saw the consolidation of mortgage businesses among the major banks. Part of GMAC's effort to expand its market share was to push its products wholesale through mortgage brokers and correspondent banks and to invest heavily in the refinance market which was booming at the time.

44.     In subsequent years, the division acquired additional mortgage-related operations, including ditech.com in 1999 which was one of California's largest mortgage lenders and an aggressive marketer of higher-risk home-equity loans. When the company was acquired then CEO of Ditech.com J. Paul Reddam stated that the sale to GMAC "gives us all the capital we need to grow". In a separate statement he stated "I think it gives us a lot of stability for good times and bad and allows us to be more aggressive in our lending practices."

- 16 -

**COMPLAINT**

1    45.    In 2000, GMAC was given conditional approval to form GMAC Bank.

2    46.    In 2005 the division was reorganized into Residential Capital (ResCap). By this time, the

3    company was heavily into subprime lending.

4    47.    In 2006, General Motors Corporation sold a 51% interest in GMAC to Cerberus Capital

5    Management, a private equity company. (The next year, Cerberus acquired Chrysler Corporation.) Also

6    in 2006, GMAC divested a majority stake of GMAC Commercial Holdings, its real estate division, to a

7    trio of investors — Goldman Sachs, KKR and Five Mile Capital Partners — thereby creating Capmark

8    Financial Group. Capmark later filed for bankruptcy and was acquired in part jointly by Leucadia and

9    Berkshire Hathaway.

10    48.    GMAC Home Services is the parent for GMAC Real Estate, formed by the purchase of

11    Better Homes and gardens Real Estate in 1998, and GHS Mortgage. Brookfield Residential Property

12    Services purchased the GMAC Home Services business in September 2008. Brookfield is a wholly

13    owned subsidiary of Brookfield Asset Management, a global asset manager located in Toronto, Canada.

14    Ally Financials subsidiary bank in the U.S., Ally Bank, offers savings products, including certificates of

15    deposit (CDs), online savings accounts, interest checking accounts and money market accounts. ResMor

16    Trust Company offers Ally-branded deposit products in Canada, including online savings, guaranteed

17    investment certificates (GIC) and tax free products. Ally Bank and ResMor Trust Company are

18    members of the Federal Deposit Insurance Corporation and Canadian Deposit Insurance Corporation

19    respectively.

20    49.    On December 29, 2008, the United States Department of the Treasury invested $5 billion

21    in GMAC from its $700 billion Troubled Asset Relief Program (TARP).

22    50.    On May 15, 2009, GMAC's banking unit changed its name to Ally Bank.

23    51.    On May 21, 2009, the U.S. Treasury announced it would invest an additional $7.5 billion

24    in GMAC LLC, which gave the U.S. government a majority stake in the company.

25    52.    On December 30, 2009, the U.S. Treasury department said that they would invest another

26    $3.8 billion in GMAC because the company had been unable to raise additional funds in the private

27    sector. This raised the total government investment in GMAC to $16.3 billion.

- 17 -

**COMPLAINT**

1     53.    On May 10, 2010, GMAC Inc. announced that it re-branded itself as Ally Financial Inc.

2     54.    On December 30, 2010, the U.S. Treasury announced it would be converting $5.5 billion

3  of interest-bearing preferred Ally stock into common equity.

4     55.    On March 31, 2011, Ally Financial filed with the SEC for an initial public

5  offering,[12]although this has reportedly been delayed by the stock market volatility of summer 2011.

6     56.    On November 9, 2011, the bank announced it was considering filing for bankruptcy-

7  protection for its ResCap mortgage unit, after the unit's loan write-downs of around half a billion dollars

8  brought it close to the legally required net asset value threshold of $250 million.

9     57.    As of January, 2012, TARP had about $12 billion invested in Ally.

10

11              *A Mandate for Growth and More Profit – But At What Cost?*

12

13     58.    In 1991 "we were 100 percent retail," Hughes recalls. The company had traditionally

14  relied entirely on retail originations through its GMAC Mortgage branches spread across the country.

15  Loan officers at these branches called on what is probably the world's largest affinity group--the

16  hundreds of thousands of people who are part of the General Motors (GM) family of employees,

17  retirees, suppliers and their employees, dealers and their employees, and others that might be reached

18  through word of mouth. This reliable base of business gives GMAC Mortgage a leg up in retail that no

    other mortgage banker can currently duplicate, according to Hughes.

19     59.    It was clear that the company would have to venture into wholesale or correspondent

20  lending if it wanted to be a consolidator, since those channels together constitute roughly 60 percent of

21  the industry's originations, according to Barry J. Bier, executive vice president of business lending at

22  _____

23

24  12 Ally Financial files for an IPO Renaissance Capital

25

26

27                                    - 18 -

28  _____

                              **COMPLAINT**

GMAC Bank in Horsham. GMAC Bank, started in 2001, is a subsidiary of GMAC Residential. So, in 1998 the company started up a de novo lending unit to offer GMAC mortgage products to correspondent banks and thrifts, mortgage brokers and builders.

60.     Due to their desire to expand and consolidate an ever growing industry they threw caution into the wind and set out to dominate the industry by any means necessary regardless of the homeowners that they hurt.

61.     The reinvention of GMAC Mortgage grew out of changes in the mortgage banking industry in the mid-1990s. During that time it became clear that players in the market would either have to become consolidators or fall quickly behind other major competitors and lose out on the growing advantage of size. In short, it became a market where one either became a consolidator or eventually might be consolidated.

62.     GMAC also did not have a significant consumer-direct channel that would bring in customers outside the GM family by telephone or Internet. To diversify into that lower-cost form of origination, GMAC acquired Ditech in 1999,[38] a web-based platform to offer mortgage products and services online.[39] Ditech was a brand that allowed GMAC to originate loans quicker and at lower cost by dealing directly with the consumer over the phone and internet, according to Ditech.com's general manager.[40] Ditech was a pioneer in offering 125 percent loans, in which the borrower could get more than the property was worth. It specialized in low-documentation mortgages, which became known as "liar's loans" because many loan officers falsified borrower's incomes.[41] GMAC adopted an aggressive marketing strategy with Ditech (with the slogan:"Lost another loan to Ditech!")  and in 2003 did $23

---

38 http://www.california-mortgage-loans.us/company-gmac-mortgage.php   "GMAC Mortgage Corporation Historical Information"
39 http://www.findbankonline.com/gmac/_ - "GMAC"
40 http://www.thefreelibrary.com/How+GMAC+built+a+lending+powerhouse%3a+GMAC+Mortgage+has+surged+into...-a0116855906
41 http://www.nytimes.com/2008/05/09/business/09norris.html?_r=1&scp=1&sq=ditech&st=nyt&oref=slogin

**COMPLAINT**

EXHIBIT A
027

1  billion in mortgage originations, from 1.6 million phone calls and millions of daily Web site hits,

2  according to Phil Armstrong, Ditech's vice president of marketing. The CalDirect brand was a second

3  consumer-direct channel, created by GMAC in 2003, to focus on upscale borrowers in California.

4      63.    GMAC's entire mortgage operation was reorganized into Residential Capital (ResCap),

5  created in 2004. The company through its subsidiary, GMAC Mortgage LLC, originates and services

6  residential mortgages under the GMAC Mortgage and Ditech brand names. It also provides capital to

7  other originators of mortgage loans.

8      64.    GMAC was one of the first lenders to securitize and sell "jumbo mortgages" (loans that

9  do not conform to purchasing and securitization guidelines adhered to be Fannie Mae and Freddie Mac)

10  on the secondary mortgage market. In addition to originating its own loans, GMAC purchased these

11  loans on the secondary mortgage market from other originators which it then packed into mortgage

12  backed securities. Jumbo mortgages typically carried higher interest rates and fees and were generally

13  purchased by low income borrowers. Lending to low income borrowers was encouraged in part by the

14  Community Reinvestment Act, which mandated that lenders lend to low income homeowners.

15      65.    For GMAC, the lessons of consolidation came quick and hard. After 1995, the big push

16  for consolidation began to knock GMAC Mortgage out of the ranks of the top 10 mortgage servicers and

17  loan originators. Between 1995 and 1997, for example, GMAC's servicing portfolio ranking fell from

18  eighth place to 13th place, according to data compiled by Inside Mortgage Finance, Bethesda, Maryland.

19  The train was leaving the station for GMAC Mortgage, which had become part of the GMAC family a

20  decade earlier in 1985 with the acquisition of Colonial Mortgage from Philadelphia National Bank and

21  the acquisition of a servicing platform in Waterloo, Iowa, from Norwest Mortgage.

22      66.    After 1995, GMAC fell even further behind in the battle for market share of loan

23  originations, as the consolidators began to expand their lending capabilities through third parties --

24  brokers and correspondents--in order to provide a pipeline of servicing rights to grow their servicing

25  portfolios.  In the race to grow the servicing portfolio, GMAC's position fell dramatically, from seventh

26  place in 1995 to somewhere below the top 30 in 1996, according to Inside Mortgage Finance. This

27  happened even though GMAC's originations rose from $2.41 billion in 1995 to $3.7 billion in 1996. In

28

- 20 -

**COMPLAINT**

1   1997, GMAC crawled back into the top 30 ranks at 28th place, with $5.08 billion in originations,
2   according to Inside Mortgage Finance.

3       67.     Similarly, GMAC Mortgage began to fall behind as a top servicer, falling from third
4   place in 1989, with a servicing portfolio of $29.7 billion, to eighth place in 1995 and 13th in 1997, with
5   a portfolio of $57.9 billion, according to Inside Mortgage Finance. After experiencing its "A-ha!"
6   moment, GMAC set about becoming a serious contender in the servicing consolidation game. In 1997,
7   GMAC acquired enough mortgage servicing rights (MSRs) from Capstead Mortgage and Fargo
8   Mortgage to push it back into sixth place in 1998 with $131.24 billion. It was also helped by the launch
9   of its wholesale operation that year.

10      68.     GMAC Mortgage has remained among the top 10 servicers since 1998, even as
11   consolidation has intensified. At year-end 2003, GMAC's portfolio stood at $201.19 billion, according
12   to Inside Mortgage Finance, putting its rank among servicers at eighth place.

13      69.     Over the last several months, GMAC has migrated its servicing portfolio to what it calls a
14   new debt service utility (DSU). The underlying technology is Mortgage-Serv, from Brookfield,
15   Wisconsin-based Fiserv Inc. The new servicing system will set the stage for more aggressive growth,
16   lower costs and better customer service, according to Tony Renzi, GMAC's vice president of national
17   loan administration. The company has servicing centers at Waterloo, Iowa; Shelton, Connecticut; and
18   Mission Hills, California.

19      70.     GMAC's growth strategy centers on a preference for growing by flipping existing
20   customers and tapping into their vast dealer and employee network to spur their growth. "Flipping"
21   means expanding the level of originations in all channels through an increased sales force and sales
22   effort aimed at all distribution channels mainly existing clients and their employee network..
23   "Acquisitions don't play a big role in our strategy," Applegate says, "We'll look for things selectively
24   going forward [to acquire] to continue to grow the business, but it's going to be more organic growth
25   than it will be an acquisition-based strategy."

26      71.     Applegate notes that acquisitions usually bring with them some level of redundancy,
27   especially now that GMAC has three strong channels: its retail branches, Ditech.com's consumer-direct

- 21 -

**COMPLAINT**

1   channel and its wholesale channel for correspondents and brokers. "Almost any transaction ends up in

2   my mind being a fairly high risk if it is done on a large scale, because the customer base is global and

3   the infrastructure is not," says Applegate. It also requires the merger of different operational systems and

4   technologies, which distracts the company away from its primary goal of building more sales by

5   expanding the sales force to bring in more customers, Applegate says.

6        72.   The senior management team views GMAC's corporate culture as essential to its success

7   in mortgage banking, according to Applegate. With large acquisitions, GMAC would face the task of

8   incorporating different corporate cultures. "We have a culture, and the culture's very important. We're

9   very customer service--oriented, and you have to be selective of who you bring into the party,"

10   Applegate says. When rates begin to rise, Applegate expects to see regional acquisition opportunities

11   that might be attractive for GMAC, as rising interest rates hit marginal operations and lead to further

12   consolidation of the industry.

13        73.   Ally announced on May 1, 2009 that it had promoted Thomas (Tom) Marano to CEO of

14   Mortgage Operations and Capital Markets Executive. Mr. Marano is famous for e-mails that were

15   uncovered when he left Bear Stearns a nearly bankrupt investment banking firm at which he worked for

16   nearly 25 years. His infamous e-mails described loans that he personally securitized and packaged to

17   investors as **"Sacks of Shit"**.

18        74.   These so called **"Sacks of Shit"** are now subject to many law suits filed by homeowners

19   who were on the other end of his **"Shitty Loans"**, as described in his e-mails to colleagues.

20        75.   Advances in technology provided growing economies of scale for larger servicing

21   companies. Lower per-loan costs and greater efficiencies helped improve the ability of consolidators to

22   competitively price mortgages, which, in turn, helped attract more customers and increased the volume

23   of originations. Thus, an industry in which no player held a defining share of the market was on the

24   brink of a battle for the survival of the biggest and fittest.

25        76.   By focusing on "flipping," GMAC began churning its pipelines to focus on their *existing*

26   clients and targeting them to refinance or move into even larger homes and bigger loans regardless as to

27   whether they could afford to pay it back. Their goal was to become the "Wal-Mart" of banking, catering

- 22 -

**COMPLAINT**

1  to middle and lower income Americans, and "helping" the less well-off buy homes. During this period

2  of time Ally Defendants held itself out to the public, including to Plaintiffs, as a well-run, prudent bank

3  that was a pillar of its community and an example to its employees, but starting about 2003, Ally

4  Defendants formalized a strategy that it had begun to implement as part of a movement from low risk to

5  high risk home loans.  That move to high-risk-lending was motivated by three little words: **"Gain on**

6  **Sale."**

7        77.    **Gain on sale** is a measure of the profit when a loan is sold on the secondary markets. In

8  2003, Applegate began his shift to Higher Margin Products and pushed for a consolidation within the

9  banking industry to gain market share. The shift they were referring to was the shift away from less

10  profitable government loans, to the most profitable Option ARM, home equity and subprime loans.

11  Subprime loans, typically priced with an interest rate at least 150 basis points (1.5%) above a bank's

12  borrowing cost are eight times more profitable for a bank than a conventional loan.

13        78.    Rapidly, these intertwined schemes grew into a brazen plan to disregard underwriting

14  standards, fraudulently inflate property values, and induce Plaintiffs into risky mortgage products-

15  county-by-county, city-by-city, person-by-person, in order to take business from legitimate mortgage

16  providers, and moved on to massive securities fraud hand-in-hand with concealment from, and

17  deception of, Plaintiffs and other mortgagees on an unprecedented scale.

18        79.    From as early as 2003, Ally Defendants senior management knew the scheme would

19  cause a liquidity crisis that would devastate Plaintiffs' home values and net worths. But they did not

20  care.

21        80.    GMAC's risky lending in the early years of the 2000's increased from 5% to 30% over

22  the evaluation period for the Office of Thrift Supervision's report on compliance with the CRA in 2003.

23  The evaluation stated that GMAC "significantly exceeded those requirements" in lending to low and

24  moderate income borrowers. During this period GMAC mortgage lending was so profitable that GMAC

25  sought to distance the company's mortgage sector from its trouble auto lending sector, and thus created

26  holding company Residential Capital, LLC. for all of GMAC's mortgage operations.

27

28

- 23 -

**COMPLAINT**

81.    In 2006, General Motors sold a 51% share of GMAC to the Japanese Bank Aozora for $7.4 billion. Aozora itself is owned by the Cerberus investment group. In 2007, GMAC's portfolio of loans held for investment was comprised 62% of subprime mortgages, and because of the mortgage crisis, it was left with no market to off load them. Cerberus reduced its stake in GMAC from 51 percent to its current minority position in December 2008, part of the condition that led to the financing company's conversion to a bank holding company and access to over $5 billion in TARP funds.

82.    With its business lending and consumer-direct arms added to its retail business, GMAC had, in fact, reinvented itself and adopted a new business model that has driven production levels from $5 billion in 1997 to $115 billion last year. The company expects to originate $65 billion this year, as the refinance wave recedes. Meanwhile, the size of GMAC's servicing portfolio has surged to 2 million loans, representing roughly $200 billion in original principal balances.

## ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN SYSTEMATIC FRAUD

83.    During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, Ally made loans in accordance with its stated underwriting and appraisal standards.

84.    Under the traditional mortgage model, which Ally and Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

- 24 -

**COMPLAINT**

85.    Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this "**originate to hold**" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

86.    With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Ally with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

87.    With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Defendants abandoned the traditional model of "**originate to hold**" and instead adopted the much more lucrative "**originate to sell**" model, and in the early 2000's Ally began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

88.    But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Bank Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

89.    In fact they *preferred* under qualified borrowers.  Because Defendants had taken out insurance policies against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit*

- 25 -

**COMPLAINT**

1   when borrowers defaulted. In other words, Defendants had an *incentive* to place borrowers into

2   impossible loans, because by doing so they made a lot of money.

3         90.    Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting

4   standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person –

5   in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud

6   hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an

7   unprecedented scale.

8         91.    It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme

9   of the last decade. Couched in banking and securities jargon, the deceptive gamble with consumers'

10  primary assets – their homes – was nothing more than a financial fraud perpetrated by Defendants and

11  others on a scale never before seen.

12        92.    To further this scheme, Ally, using its size and prominent market share, began

13  systematically creating false and inflated property appraisals throughout California, hand-in-hand with

14  the other Defendants herein, namely HCLS. The purpose was twofold:

15            a.  First, by falsely inflating said property values, investors were defrauded into believing

16                their investments in these loans were less risky than they actually were. This in turn

17                led to more sales and even more profits on the secondary market.

18            b.  Second, Defendants would then turn around and use these false property valuations to

19                induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly

20                risky terms.

21        93.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2,

22  2011 they outlined how this brazen planned worked. Ally would use their in-house or contract

23  appraisers at Home Connects Lending Services to artificially inflate Plaintiff's home values in order for

24  their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal

25  will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs'

26  homes.

27

28

- 26 -

**COMPLAINT**

94.     These inaccuracies with respect to their Loan-to-Values ratios also indicate that the representations that were made to them were false and that at Ally's direction appraisal practices were unsound. Ally and their affiliates furnished appraisals to the Plaintiffs that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.

95.     According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results".

96.     From as early as 2005, Ally's senior management *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worths. But, they didn't care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

97.     Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

98.     This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Defendants' business that devastated the values of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net worth.

99.     The Defendants' business premise (although concealed from the Plaintiffs) was to leave the borrowers, including Plaintiffs, holding the bag as the Defendants used the Plaintiffs and other borrowers as pawns in massive securities games and fodder to feed its fraud on investors perpetrated on a global scale. This massive fraudulent scheme was a disaster both foreseen by the Defendants and waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their scheme

- 27 -

**COMPLAINT**

1  without telling them. In fact, had the Plaintiffs been aware of the true facts which the Defendants

2  concealed and failed to disclose, they would not have entered into these transactions.

3       100.    At the very least, at the time of entering into the notes and deeds of trust referenced

4  herein with respect to each Plaintiff, the Defendants were bound and obligated to fully and accurately

5  disclose to each borrower, including each Plaintiff herein, that the loan and mortgage being offered to

6  the Plaintiff was, in fact, part of a massive fraud that the Defendants knew would result in the loss of the

7  equity invested by each Plaintiff in his or her home, the severe impairment of each Plaintiff's credit

8  rating, and the other damages described in this Complaint

9       101.    Since the homes of Plaintiffs herein were Ally's main target, this scheme led directly to a

10  mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic

11  problems facing Defendants' borrowers in the rest of the United States.

12       102.    As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes,

13  their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs

14  and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers

15  billions of dollars in interest payments and fees and generated billions of dollars in illegal and

16  fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for

17  fraudulent swaps.

18       103.    Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs'

19  property values, and property values throughout the State of California, as well as (2) Defendants'

20  abandonment of their own as well as industry standard underwriting guidelines, coupled with (3)

21  Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary

22  market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were

23  justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and

24  (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans

25  than they could afford or should have been placed into. The additional fees, points and interests paid as a

26  result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of

27  restitution.

28

- 28 -

**COMPLAINT**

104.    Further, Defendants either directly or through their subsidiaries, including ETS, often charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein.   The award of damages or restitution for these unmerited fees obtained through deceit is proper.

### THE FRAUDULENT APPRAISAL PROCESS

105.    An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase of "Mortgage Insurance" to insure against the additional risk associated with such high LTV loans. The idea being that a high LTV means that a borrower has invested little of his own money in the property, and is thus more likely to walk away from the property when things get tough. Now imagine the above scenario with a slight modification - instead of the above property being appraised at $100,000 dollars, the appraisal was manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

106.    From an **investor's perspective**, a high LTV ratio represents a greater risk of default on the loan, which means they are unwilling to pay as much for that loan as they would one which was less risky.  This is true for a number of reasons. First borrowers with a small equity position in the underlying property have "less to lose" in the event of default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which

- 29 -

**COMPLAINT**

1   might cause the borrower to default and would prevent the issuing trust recouping its expected return in

2   the case of foreclosure and subsequent sale of the property.

3       107.    From the **Defendant bank's perspective**, because of their shift from the "originate to

4   hold" model to the "originate to sell" model, Defendant was incentivized to enter into as many loans as

5   possible to sell on to the secondary market for profit. Because they weren't holding these loans anymore,

6   Defendants held no risk – they had no reason to ensure that the borrower was adequately qualified, or

7   more importantly, in the context of *this* discussion, that the property had sufficient value, because

8   Defendants immediately turned around and sold that loan. Here's where things take a turn for the worst

9   – because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were

10   given an incentive to fraudulently inflate the appraisal values of their property, thus making the

11   collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them.

12   More value to the investors means more money in Defendants pockets. And so it began, Defendants

13   quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout

14   the State of California, because, in short, they made a *lot more money by doing so.*

15       108.    At Ally Defendants' behest, and at their direction, Home Connects Lending Services

16   began systematically inflating the valuations they rendered upon the subject properties of each loan,

17   including the loans of Plaintiffs herein. As is common knowledge in the real estate industry, appraisers

18   take the value of other nearby homes (called comparables aka "comps") into account in determining the

19   value of the homes they appraise. **These inflated appraisals and home valuation conducted by Ally**

20   **and HCLS** *then* **acted as comps upon which numerous** *other* **appraisers based their valuations of**

21   *other* **homes. The results were a vicious self-feeding exponential cycle, both expected and**

22   **intended by Defendants. Ally's inflated appraisals caused other homes to be valued for more than**

23   **they were worth, which in turn acted as the predicate for even higher appraisals and which caused**

24   **even more homes to be valued for more than they were worth.** The inevitable and intended result of

25   Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy,

26   created by and at the direction of Defendants, designed to manipulate and inflate property values, and

27   effectuated for the sole purpose of lining Ally's (and other Defendants') pockets with money. The harm

- 30 -

**COMPLAINT**

1   it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American

2   economy mattered little. Defendants were making money and plenty of it.

3   Defendants had another reason for driving the prices of real estate up – by doing so Defendants created

4   the illusion of a naturally appreciating real economy, which resulted in a purchase *and* refinance boom –

5   which meant more loans for Defendants, and thus more money.

6        109.    From the **Borrower's perspective** (Plaintiffs herein), the harm was five-fold:

7          a.  The hyper-inflated property values intended and caused Plaintiffs to pay more for

8                their homes (or to refinance their homes for more) than they were truly worth. When

9                the market corrected itself, Plaintiffs immediately suffered a substantial loss of

10               equity.

11         b.  The hyper-inflated property values also caused Plaintiffs to pay substantially higher

12               property taxes.

13         c.  Defendants also used these inflated values, to induce Plaintiffs and other borrowers

14               into entering ever-larger loans on increasingly risky terms. The result was more

15               money for Defendants.

16         d.  With the inflated property values as their predicate, Defendants placed Plaintiffs into

17               inflated loan amounts, unjustified by the true *uninflated* value of Plaintiffs' property.

18               Defendants used these intentionally inflated loan amounts to charge Plaintiffs even

19               more interest, points and fees, than would have been proper under the terms of a non-

20               inflated loan value. The result was, shockingly, even more money for Defendants.

21         e.  The resultant higher payments coupled with the housing crash (both known if not

22               intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc

23               with their credit, and upon which Defendants charged a host of excessive fees (trustee

24               fees, default fees, cleanup fees, inspection fees, late fees, advance fees, and attorney

25               fees) all of which were marked up dramatically. In short, Defendants couldn't lose;

26               they were making money no matter what, and were benefitting from Plaintiffs'

27               default. By tossing on so many fees Defendants made it impossible for Plaintiffs to

- 31 -

**COMPLAINT**

1             be able to ever pay off their "default" amounts. Why? Because Defendants made

2             money by doing so. By making it impossible for Plaintiffs to pay off their unilaterally

3             imposed default amounts, Defendants could come in and scoop up whatever equity

4             Plaintiffs had left in the property. It was a win win win scenario.

5       110.   Many mortgage loan originators, including Ally and Defendants herein, allowed the sales

6 personnel or account executives to order and control the appraisal process. These personnel were

7 typically on a commission-only pay structure and were therefore motivated to close as many loans as

8 possible. These sales personnel and account executives would pressure appraisers to appraise properties

9 at artificially high levels or they would not be hired again, and were afforded the ability to do so by the

10 very policies and procedures explicitly set forth by Ally and Defendants. According to the April 7, 2010

11 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years

12 and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly

13 susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't

14 be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers

15 to increase the value." He continued:

16       To put things in perspective, during my company's history, half of all the loans we

17       underwrote were overvalued by as much as 10%. This means one out of two appraisals
      were still within an acceptable tolerance for our end investors. Our experiences showed

18       that 10% was the most an appraisal could be overvalued and still be purchased by
      investors. Another quarter that we reviewed were overvalued by 11-20%. These loans

19       were either declined or we reduced the property to an acceptable tolerance level. The
      remaining 25% of appraisals that we initially underwrote were so overvalued they defied

20       all logic. *Throwing a dart at a board while blindfolded would've produced more accurate*

21       *results*

22       111.   Mr. Bitner testified about the implications of inflated appraisals:

23       **If multiple properties in an area are overvalued by 10%, they become comparable**
      **sales for future appraisals. The process then repeats itself.** We saw it on several

24       occasions. We'd close a loan in January, and see the subject property show up as a

25       comparable sale in the same neighborhood six months later. Except this time, the new
      subject property, which was nearly identical in size and style to the home we financed in

26       January, was being appraised for 10% more. Of course, demand is a key component to

27       driving value, but the defective nature of the appraisal process served as an accelerant.

- 32 -

**COMPLAINT**

EXHIBIT A
040

28

112.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

113.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

114.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

115.    Because HCLS was owned by Ally, Ally and Defendants herein directed HCLS as their alter ego to provide the results requested, or engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that met Ally and Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Ally black-listed appraisers who did not provide appraisal reports with Ally's expectations.

116.    This coercion to fraudulently inflate appraisal values was particularly rampant in the context of refinance transactions. When a property didn't appraise for a high enough value, a deal wouldn't "go through." This meant that (1) the loan consultant on the transaction wouldn't get a commission, (2) the Area Divisions (sometimes referred to as "Home Loan Centers" – often comprised of hundreds of loan consultants over several cities, and managed by a single manager) which were paid handsomely for each funded loan wouldn't get paid, and (3) Defendants wouldn't be able to sell the loan on the secondary market for profit. Nobody made money. However, the system was set up to allow

- 33 -

**COMPLAINT**

1   coercion, bribery, and undue influence over the appraisers. Loan consultants would contact appraiser

2   and direct them specifically as to what value was "needed" to make the deal go through, some even

3   going so far as to give gifts to the appraisers, and many were given outright bribes. Area Division

4   managers who also had a financial incentive as mentioned earlier, would exercise undue influence and

5   contact appraisers and demand certain values from them, abolishing the exercise of independent thought

6   necessary to render an accurate/good faith appraisals. The same Area Division Managers, because of

7   their power and influence within the company, would even go so far as to call the appraisal group's

8   *managers* and request (read "demand") an appraisal to come in at a certain value, or if that appraisal had

9   already been rendered and it was too low, would request the appraisal value to be "bumped" or

10  increased. The Area Division Managers who often had personal or friendly relationships with the

11  Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in favors" from the Appraisal

12  managers to ensure that the appraised value of the subject property was high enough to make the deal

13  "go through," so that all parties could make their money. The Appraisal managers obliged.

14      117.    On other occasions appraisers and/or their managers would be instructed to use

15  overvalued, inflated or out-of-area comps from non-comparable *superior* properties in valuing the

16  subject property for the purpose of arriving at a higher value than would be supported by nearby or

17  appropriate comps. Defendants intended this to artificially inflate the appraised value of the subject

18  property.

19      118.    On the rare occasion when a loan consultant's or Area Division Manager's influence

20  didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies

21  gave them another, more effective way to fraudulently inflate the amount – they were allowed to hire an

22  *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in

23  the amount they were told to deliver. Why? Because they were being paid directly by the loan

24  consultant, or the Area Division Manager. In other words, loan consultants and Area Division

25  Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results

26  (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping

27  the client happy and hopefully earning future business and (2) for fear of not getting paid on their

- 34 -

**COMPLAINT**

1   individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing

2   the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies,

3   and its use was encouraged by Defendants, as well as their mid-level and upper management.

4       119.    This coercion and influence even existed from the top down – Regional Managers (in

5   charge of entire portions of the country, several states large) would also call in favors and demand

6   appraised values to be inflated or changed to make deals happen in the interest of making money. This

7   pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded

8   loans meant more money for Defendants (who as described above, held none of the risk). In fact,

9   Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of

10  influence over appraisals and the appraisal departments. This influence was intended and foreseen.

11      120.    In short, Defendants intentionally designed an appraisal system which they could

12  manipulate through influence and coercion to further their own ends – namely, profit. By its very design,

13  the independence of thought necessary for a professional appraiser to render a good faith opinion was

14  decimated. (1) Defendants *owned* the very appraisal company which was supposed to render

15  independent appraisals. Then, (2) Defendants through its explicit (as well as unwritten) policies and

16  procedures, intentionally allowed  their own employees who made commission/money as a function of

17  every funded loan (managers, loan consultants, etc.), to contact individual appraisers and bribe, exercise

18  influence, call in favors,  harass, and coerce appraisers into rendering the exact value they needed. And

19  finally, when all else failed (3) Defendants set up a fail-safe; they created an internal policy which

20  allowed for the hiring of "outside" appraisers who were particularly well known within the industry for

21  being willing to "fudge" the numbers.

22      121.    Moreover, as HCLS was Ally's wholly owned subsidiary, HCLS was specifically

23  directed by Defendants to systematically "bump" or inflate appraisal values of homes throughout

24  California, with the intent of creating housing appreciation, leading to a real estate boom, which

25  Defendants could then capitalize on by selling not only more loans, but more loans at even higher loan

26  amounts. From the very top to the very bottom, Defendants created a system intended to render

27  consistently inflated appraisals. But they knew the 'boom' they were creating, was one stilted up and

- 35 -

**COMPLAINT**

1   fueled by their fraud – and that when the music stopped playing the house of cards they'd built would

2   come crumbling down destroying any and all equity Plaintiff borrowers had in their home.

3       122.    These artificially inflated appraisal reports and values were then used by homeowners

4   and real estate agents alike in setting sales prices for their homes, resulting in artificially inflated sales,

5   both known and intended by Defendants.  Defendants told their borrowers that the value their property

6   appraised for was the true value of their property. Furthermore, Defendants went so far as to furnish the

7   appraisal reports to many of their borrowers, including Plaintiffs herein. **The result was a vicious**

8   **exponential cycle. The artificially inflated sales would act as comps, inflating the sales prices of**

9   **other homes. The cycle would repeat**. And Defendants intended it to repeat because it perpetuated an

10  inflationary real estate economy in California, which resulted in massive profit to the Defendant Banks.

11      123.    Ally and Defendant conspirators perpetrated this systematic appraisal fraud at the

12  direction of the conspiracy, and with the knowledge and acquiescence of their executives and board

13  members.

14      124.    .To carry out this fraud, GMAC, hand-in-hand with the other Defendants herein, used its

15  size and market share as one of the largest lenders in California to systematically create false and

16  inflated property appraisals throughout California, through its wholly-owned subsidiary HOME

17  CONNECTS LENDING SERVICES, LLC. (HOME CONNECTS LENDING SERVICES, LLC is a

18  division of Defendant Ally Bank – hereinafter "HCLS")

19

20              *Defendants' Scheme to Fix the Market*

21          *Through Their Wholly-Owned Appraisal Subsidiary:  HCLS*

22

23      125.    HCLS was created in 1999 as a GMAC brainchild.  GMAC figured that if they could

24  control all of the settlement service providers, including appraisers, it would make it easier for Ally

25  Defendants to carry out this fraud. Any borrower, broker or lender that chose to conduct business with

26  GMAC was forced to use their settlement service providers as a standard course of business. If a broker

27  submitted a loan, the appraisal was to be done by someone on the HCLS approved appraiser list. The

- 36 -

**COMPLAINT**

1  homeowners were also required to pay for a secondary appraisal review through HCLS. Since there

2  were two appraisals that were done on each property the aggregator being ResCap was now able to

3  choose which appraisal would suit them best for their multiple transactions. The homeowners would be

4  disclosed one value and the secondary appraisal done by HCLS could be used for Secondary Market

5  purposes.

6       126.   As the owner, GMAC exercised its vast influence over HCLS to artificially inflate and

7  manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and

8  increase their profits. Their purpose was two fold:

9           a.  First, by falsely inflating said property values, investors were defrauded into believing

10              their investments in these loans were less risky than they actually were. This in turn

11              led to more sales and even more profits on the secondary market.

12           b.  Second, Defendants would then turn around and use these false property valuations to

13              induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly

14              risky terms. The result was, again, more profits.

15       127.   Furthering this scheme, GMAC & Homecomings Financial then struck sweetheart deals

16  with some of the Nation's largest homebuilders in which they collaborated to artificially inflate the

17  values of the properties being built and through a joint venture. Some of the largest homebuilders such

18  as Lennar Homes. The unsuspecting homeowners would be forced to pre-qualify through the builders

19  so called "In-House Lender" and they would be incentivized with offers of free upgrades or credits

20  towards their closing costs only to be overcharged for these loans and artificially inflated purchase price

21  that would cover the incentives. Since GMAC was the in house lender they could easily manipulate the

22  value of the homes since their own appraisers would be appraising the properties, and in fact, they did

23  just that.

24       128.   Hand-in-hand with their builders and Landsafe companies, Defendants could carry out

25  the fraud without anyone ever finding out. If the appraisals were done by independent appraisers the

26  homeowners would have found out that the homes they were purchasing or refinancing were being over

27  valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The

- 37 -

28

**COMPLAINT**

1   customer never had a choice as to the settlement providers.  Ally Defendants controlled and took the

2   choice out of the customer's hands and directed and collaborated with all their partners to systematically

3   inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of

4   their homes. In furtherance of this act they used the manipulated property valuations to seek premiums

5   on Secondary Market transactions. Ally Defendants not only defrauded the Plaintiffs, but the rating

6   agencies that graded the paper being sold, the insurance companies who assessed the risk of the loans

7   being insured through loan to valuation risk models and their investors.

8        129.   From as early as 2004, GMAC's senior management, and AllyDefendants *knew* the

9   scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worths.  But,

10   they did not care, because their plan was based on insider trading – pumping for as long as they could

11   and then dumping before the truth came out and Plaintiffs' losses were locked in.

12        130.   These acts are now subject of numerous complaints and very large scale litigations and

13   settlements. The largest recently announced lawsuit was filed by the Federal Housing Finance Agency

14   as Conservator for Freddie Mac. The complaint alleges that Ally Defendants furnished appraisals that

15   they understood were inaccurate and that they knew bore no reasonable relationship to the actual value

16   of the underlying properties. Some of Plaintiffs loans seeking relief in this complaint are part of these

17   REMIC's as mentioned in the FHFA complaint.

18

19   ***Defendants Systematically Abused & Abandoned Their Underwriting Guidelines***

20   ***To Place Unqualified Borrowers Into Loans They Could Never Afford***

21        131.   As mentioned above, however, Defendants' fraud was multipronged. To feed its investors

22   and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn,

23   Defendants Banks systematically and intentionally began disregarding their own underwriting standards,

24   and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the

25   door, and sold to investors for a profit, as possible.

26        132.   In other words, not only did Defendants inflate appraisal values in the name of making

27   the loans appear safer to investors, and thus more profitable to the banks, but Defendants also abandoned

28

- 38 -

**COMPLAINT**

1    their own underwriting guidelines to approve more and more borrowers for loans. In doing so,

2    Defendants intentionally placed borrowers into loans which would imperil their entire livelihoods, and

3    often cases into loans whose default was an absolute mathematical certainty. The result was, once again,

4    more profit obtained through deception.

5         133.   To achieve their fraud, Defendant Banks intentionally and grossly falsified Plaintiffs'

6    salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values,

7    rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to

8    approve borrowers who could never have been approved under their own published conventional

9    underwriting guidelines (as well as industry standard underwriting guidelines used throughout the

10   United States.) Second, they were able to conceal from the investor the highly risk nature of the loan,

11   which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans.

12   The translation is that Defendants had every incentive to deceive borrowers into entering loans which

13   they realistically could never afford.  The result was that Defendants turned unimaginable ill-gotten

14   profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left

15   without a chair.

16        134.   In fact, Defendants intentionally put mechanisms and programs in place to allow their

17   own employee's/Loan Consultants/Loan Representatives to **falsify** the income, asset and other material

18   information of their borrowers, without a borrower ever knowing that their income or assets had been

19   inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant

20   Banks would take as true any income stated on the application, without requesting any documentation in

21   support. Seizing this unbridled free-for-all, Defendants' own employees who were paid commission

22   based on the number and size of loans they got approved, rampantly falsified material income and asset

23   information of their borrowers. By doing so they were paid more commission. But more importantly,

24   Defendant Banks themselves created more product to be sold on the secondary market for even more

25   profit. In other words, Defendants intentionally put policies and programs into motion which would

26   allow it to place unqualified borrowers into loans – all while maintaining the semblance of propriety,

27

28

- 39 -

**COMPLAINT**

1  and all without ever having to disclose to their investors that the incomes listed on their loan

2  applications were false.

3       135.    Numerous others similar programs were also adopted such as **"stated assets"**, and **"low**

4  **documentation loans".**  Both of which allowed Defendants to falsify information, and get loans

5  approved which would  never been approved under traditional documentation

6       136.    Even in the absence of these programs Defendants and their employees nevertheless had

7  the ability to and did, falsify their borrower's income and assets through numerous other means. For

8  example, Defendants would inflate a borrower's income by making it appear as though the borrower

9  was earning rental income on of their other properties when in fact they were earning none.  To

10  legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely false

11  rental agreement, showing the false monthly rental income, complete with the forged signature of a non-

12  existent renter.

13       137.    Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions

14  by as much as a mind-numbing 300%. An egregious number by any measure.

15       138.    Defendants were intentionally turning a blind-eye to the rampant and egregious

16  manipulations of incomes by their own employees, through policies and programs intentionally set forth

17  by Defendants' very own top executives to achieve *just such a result*. The result was that Defendant

18  were able to originate loans which they knew were false, and they intended to be false, but without ever

19  having to *admit* to their secondary market investors that the loans were, in fact, false.

20       139.    Defendant banks knew and intended that their employees would falsify this information,

21  for the very reasons set forth above, and in fact incentivized them through their commission and reward

22  structure to do so.  In other words Defendants intended that this program would be abused. And by

23  doing so, Defendants allowed and intended for their borrowers to be placed into loans which the

24  borrowers had no chance of being able to afford had their true income/asset information been used. .

25       140.    Defendants then told their borrowers, and Plaintiffs herein, that a determination by  the

26  Bank that they were *"qualified"* for a loan meant that the borrowers would be able to *"afford"* their loan

27

28

- 40 -

**COMPLAINT**

141.    Because Defendants held themselves out as (1) experienced professionals (2) with superior knowledge, education, and expertise, (3) a bank their customers and borrowers could trust and rely on[48] Borrower plaintiffs believed them, and justifiably so.  Borrower Plaintiffs were deceived into reposing trust into the very company who would defraud them.

142.    . For the purposes of the following paragraphs it is important to define two key terms: "**front-end**" debt to income ratio, and "**back end**" debt to income ratio.

143.    A "**front end**" debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

144.    A "**back end**" debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

145.    Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt

---

[48] See Ally's ads -  "We make money with you, not off you" - http://www.businessinsider.com/ally-bank-print-ad

- 41 -

**COMPLAINT**

1 | to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as

2 | 720+ median credit score and high liquid asset reserves totaling more than 12 months of their ).

3 |     146.   However, Defendants in this action regularly approved loans with front end ratios wildly

4 | exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of course,

5 | in violation of their own published underwriting guidelines as well industry standard underwriting

6 | guidelines used throughout the banking industry.

7 |     147.   In many cases, borrowers were approved with front-end debt to income ratios at almost

8 | 100%. In other words, borrowers were being approved for mortgages, where after spending almost every

9 | penny of their monthly income, they would have almost nothing left over to pay for the myriad other life

10 | expenses such as electricity, gas, car payments, telephone, insurance, medicine, or even food.

11 |

12 | ***Defendants Turned Substantial Profit Through Their Borrowers' Default –***

13 | ***Furthering Their Incentive to Intentionally Place Plaintiffs***

14 | ***Into Impossible and Unaffordable Loans***

15 |     148.   Not only did Defendants approve under qualified borrowers – they preferred them. That's

16 | because a defaulting borrower meant profit for Defendants.

17 |     149.   All of the Defendants managed risk through leverage and derivatives trading. With the

18 | advent of "Credit Default Swaps" ("CDS"), they had the protection they needed to push these loans out

19 | the door to grossly under qualified borrowers, without any fear of loss whatsoever. The CDS gave

20 | defendants *another* incentive to give grossly under qualified borrowers – whose default was virtually

21 | certain. Not only (1) were Defendants incentivized to give loans to unqualified borrowers because they

22 | were turning other-worldly profit by selling as many loans on the secondary market as possible, *but also*

23 | ... (see next paragraph)

24 |     150.   (2) Because Defendants had taken out these insurance policies – aka Credit Default

25 | Swaps - against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get

26 | paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous

27 | redundant Credit Default Swaps and insurance policies out on the same property, so that when default

28 |

- 42 -

**COMPLAINT**

EXHIBIT A
050

1    occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were

2    *actually turning a profit* when borrowers defaulted.  In other words, Defendants had an *incentive* to

3    place borrowers into impossible loans, because by doing so they made a lot of money.

4        151.    This technique gave these Defendants the insurance they needed to pass the risk along to

5    third party without taking the risk themselves.  Since they planned on securitizing all of their loans and

6    not keeping any of them, the Defendants could not care less about quality or who they hurt.  They would

7    push insurance on the investors and actually over insure the loan pools, at times betting that the

8    Plaintiffs and other borrowers would default.

9        152.    Since the Defendants created these pools to begin with, they were fully aware of the lack

10   of quality and lack of due diligence that went into setting up these pools.  These "swaps" are life

11   insurance policies that are placed on Plaintiffs' loans.  If the loan dies, the Defendants get paid.

12       153.    These swaps have been considered to be so dangerous that the majority of the financial

13   world has simply stayed away.  They are best described by the following prominent experts:

14           a.   Nobel prize-winning economist George Akerlof predicted that CDS would cause the

15                next meltdown;

16           b.   Warren Buffett called them "weapons of mass destruction";

17           c.   Warren Buffett's colleague, Charles T. Munger, has called the CDS prohibition the

18                best solution, and said "it isn't as though the economic world didn't function quite

19                well without it, and it isn't as though what has happened has been so wonderfully

20                desirable that we should logically want more of it;"

21           d.   Former Federal Reserve Chairman Alan Greenspan says CDS are dangerous;

22           e.   Newsweek called CDS "The Monster that Ate Wall Street"

23           f.   President Obama said in a June 17 speech on his plans for finance industry regulatory

24                reform that credit swaps and other derivatives **"have threatened the entire financial**

25                **system;"**

26

27

                                              - 43 -

28   

                                          **COMPLAINT**

g.  In a February 9th, 2012 speech, President Obama scolded "irresponsible" and "reckless" lenders, who "sold homes to people who couldn't afford them". He continued:

> "It's well known that millions of Americans who did the right thing and the responsible thing -- shopped for a house, secured a mortgage that they could afford, made their payments on time -- were, nevertheless, hurt badly by the irresponsible actions of others: by lenders who sold loans to people who couldn't afford them; ... by banks that took risky mortgages, packaged them up, and traded them for large profits. "
>
> "It was wrong and it cost more than 4 million families their homes to foreclosure"
>
> "Even worse, many companies that handled these foreclosures didn't give people a fighting chance to hold onto their homes. In many cases, they didn't even verify that these foreclosures were actually legitimate. Some of the people they hired to process foreclosures used fake signatures to -- on fake documents to speed up the foreclosure process. Some of them didn't read what they were signing at all."

...

> "The mortgage fraud task force I announced in my State of the Union address retains its full authority to aggressively investigate the packaging and selling of risky mortgages **that led to this crisis**"

h.  George Soros says the market is still unsafe, and that credit- default swaps are "toxic" and "a very dangerous derivative" because it's easier and potentially more profitable for investors to bet against companies by purchasing swaps rather than shorting their publicly traded stocks.

- 44 -

**COMPLAINT**

1    154.   But insurance against default wasn't the only way Defendants made money from the

2    losses of their imperiled borrowers. Defendant banks also made money by charging a litany of unearned

3    and egregiously marked up fees associated with the initiation of and conducting (their own wrongful)

4    foreclosures including: inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee

5    fees. In short Defendants had an incentive *to place Plaintiff borrowers into loans they knew their*

6    *borrowers could not afford* because by doing so, the bank would turn a profit. Not only that, but

7    Defendants had an incentive *to wrongfully initiate foreclosures* because they made money by doing so

8    through the assessment of excessive, disproportionate and unearned fees.

9

10

11                          ***Defendants' Liar Loans***

12    155.   Ally adopted a strategy it knew would jeopardize its very existence yet the temptation to

13    make money was so great, that they had reckless disregard for its shareholders and their borrowers. Ally

14    began to create fictional income and real losses by defrauding the insurance companies that were the

15    counterparties to their credit default swap hedging.  Their primary business was as a market maker for

16    what the trade called "liar loans" and Ally called "Alt-A" loans, handled through its subsidiaries,

17    including, among others, Ally, GMAC Mortgage, RFC, and Homecomings as well as through loans

18    purchased through collateralization channels.

19    156.   Defendants sold toxic mortgages to the public through their origination channels.  They

20    were then securitized by Residential Capital, other financial arms of Ally and Ally Defendants, and its

21    executives, and were heavily insured against losses, while essentially shorting their own collateralized

22    debt obligation securities sold to investors.  They perpetrated the "Naked Short" the very mortgage

23    backed securities that they had just securitized by buying insurance on securities they had already

24    hedged in other contracts.  They reaped illicit profits from this activity and also engaged in the "Double

25    Dip" by forcing the original originators to re-purchase defaulted loans at lower prices.

26    157.   In a complaint filed by the Federal Trade Commission they found Homecomings

27    Financial guilty of violations of the Equal Credit Opportunity Act. The complaint that ensued indicated

                                       - 45 -

                              **COMPLAINT**

1    that African –American and Hispanic borrowers paid more for mortgage loans that non-Hispanic whites.

2    Based on an extensive investigation done by the FTC, which included obtaining and analyzing

3    Homecomings' full and complete loan date, the staff's statistical analyses of the data show that, on

4    average, Homecomings charged African-American and Hispanic borrowers substantially more for home

5    purchase and refinance loans than similarly-situated non-Hispanic whites. The staff further determined

6    that these disparities were caused by Homecomings' policy and practice of allowing its brokers and loan

7    officers broad discretion to determine the amount of discretionary fees charged to borrowers in addition

8    to the risk-based price.

9        158.    The staff concluded that the disparities in these discretionary charges are substantial,

10   statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics

11   in violation of the ECOA and the FTC Act.

12       159.    By Machiavellian legal maneuvering, Defendants were able to hide this information from

13   the public eye, its shareholders, and customers who were hurt the most by these misgivings.

14       160.    Plaintiffs believe and therefore allege that Defendants, through the actions of their

15   executives, employees, appraisers and current Ally and ResCap CEO's Michael A. Carpenter and

16   Thomas (Tom) Marano, are all largely responsible for the collapse of the real estate market within the

17   State of California.

18       161.    Defendants sold toxic mortgages to the public through their origination channels.  They

19   were then securitized by ResCap, RFC and other financial arms of Ally Defendants, and its executives,

20   and were heavily insured against losses, while essentially shorting their own collateralized debt

21   obligation securities sold to investors.  They perpetrated the "Naked Short" the very mortgage backed

22   securities that they had just securitized by buying insurance on securities they had already hedged in

23   other contracts.  They reaped illicit profits from this activity and also engaged in the "Double Dip" by

24   forcing the original originators to re-purchase defaulted loans at lower prices.

25       162.    This ability to immediately hedge poorly underwritten mortgage loans by purchasing

26   credit default swaps that covered all loss of default, gave the Defendants even less incentive to monitor

27   the performance of existing loans or the quality of new loans.  In turn, the Defendants foisted tranches of

- 46 -

28

**COMPLAINT**

Alt-A mortgage loans off on the market to investors who had every right to expect that the Defendants were selling securities of assets that had been issued under traditional underwriting standards. This manipulative and purposeful conduct inflated the inevitable bubble that burst at the expense of Plaintiffs while the Defendants were protected from loss through a number of mechanisms.

163.    Using one such technique, Defendants sold toxic mortgage securities secured by the Plaintiffs' homes to investors, and then sold back the bad loans with early payment defaults to the banks that originated them at a discount. The traders pocketed the refund, and did not pass it on to the mortgage trust which is where the Plaintiffs' loans resided. Said mortgage trust is where the refunds should have gone to be distributed to the investors who owned the bonds. The Defendants instead collected the insurance from the "Swaps" and pocketed the difference of the buybacks as well, all without ever notifying the investors. This is now the subject of ongoing litigation with their insurers including AIG and AMBAC.

164.    Defendants have shown a pattern of fraud from the inception of these loans all the way through securitization, and evidently have continued that fraud to this very day, and will not stop until and unless this Court enjoins them.

165.    Defendants' attempted to clean up this mess by preying on unsuspecting homeowners and foreclosing on their homes. As soon as a foreclosure was perfected, then the hidden insurance policies kicked in. The investors won, the banks won, but the Plaintiffs lost everything that they had ever worked for, which includes, particularly, their homes.

166.    Just like in GMAC's Mortgage business, in Ally's loan business, volume was king. Loan officers got paid per loan, and got paid more per loan if certain volume targets were met and certain loan products were pushed. Loan processors were given volume incentives as well as were entire loan processing centers. Even risk managers were evaluated, in part, on the extent to which they supported revenue growth targets. Not surprisingly, people cut corners to keep the conveyor belt moving and increase their pay.

167.    Defendants set out to destroy every last dollar of equity left in Plaintiffs' homes. They wrote mortgages with total disregard as to whether the Plaintiffs could afford them or not. Through

- 47 -

**COMPLAINT**

1  deception and a sleight of hand Plaintiffs were pushed into highly toxic mortgage products that would

2  maximize profits for Defendants, but destroy the Plaintiffs' values.

3       168.    Liar loans produce intense "adverse selection," because Ally had to generate mortgages,

4  without regard to the borrower's creditworthiness.  Ally thus became the refuge of those who could not

5  obtain a mortgage elsewhere.

6       169.    Liar loans also are "criminogenic" – they create epidemics of mortgage fraud – because

7  they create strong incentives to encourage borrowers to provide false information on their loan

8  applications.

9       170.    The combination of these two phenomena results in mortgages that have a deeply

10  "negative expected value" to the lender.  That means that the average dollar lent on a liar's loan creates a

11  loss.  Those losses, however, might not be realized for many years, particularly if the liar loans

12  contribute to creating a "bubble" of rising home prices by expanding the number of individuals who can

13  afford to purchase a home.  However, once the time comes to "pay the piper" there is no avoiding severe

14  financial distress and a resulting constriction in funds available for further loans.

15       171.    When a large mortgage provider such as the Defendants go from pouring vast sums of

16  imprudently invested capital into the mortgage market, to bankruptcy and lesser financial distress that

17  cuts off the pipe-line, the foreseeable and inevitable consequences are a reduction in the number of

18  potential home purchasers and the prices that can be afforded by those who remain in the market.  It is

19  then a question of simple basic supply and demand economics:  pouring vast sums of capital (capital

20  invested for an unlawful purpose) increases demand and creates an artificial bubble.  Cutting off the

21  spigot causes a crash.

22       172.    The consequences of the Defendants' acts were foreseeable and known to Defendants

23  from the first moment they stopped lending on fundamentals and started lending to feed their schemes of

24  marketing fraudulent collateralized mortgage pools and engaging in fraudulent swap transactions.

25       173.    In the near term, liar loans increased the reported profits of the lender.  As long as the

26  bubble inflates, the liar loans can be refinanced, creating more reported income and delaying (but

27  increasing) the eventual loss.  During the S & L debacle, the saying was: "a rolling loan gathers no loss."

- 48 -

**COMPLAINT**

1    174.   In 2008, Defendants faced an unprecedented loss as a result of its large positions in

2    subprime and other lower-rated mortgages, the details of which have been previously alleged.

3

4                  Defendants Misled the Public – Including Plaintiffs

5    175.   The Defendants concealed and did not accurately or fully disclose to any Plaintiff herein

6    any of the foregoing facts.  Further, Defendants did not disclose or explain their scheme to Plaintiffs at

7    any time.   They did the foregoing with the intent to deceive Plaintiffs and the investing public.

8    Plaintiffs did not know the massive scheme Defendants had devised.

9    176.   To the contrary, Defendants affirmatively misrepresented its underwriting processes, the

10   value of its mortgages and the fundamental nature of its business model in its press releases, annual

11   report and securities filings, all of which were widely distributed to the public, including Plaintiffs.

12   Defendants intended the public, including Plaintiffs, to rely upon its misrepresentations and made those

13   misrepresentations to create false confidence in Defendants and to further its fraud on borrowers and

14   investors.

15   177.   Plaintiffs would never have done business with the Defendants if Defendants had

16   disclosed their scheme.  Had the Plaintiffs known the facts concealed from them by Defendants,

17   Plaintiffs would have never entered into bogus and predatory transactions with the Defendants designed

18   only to line the pockets of Defendants and their executives and not to actually and justifiably create

19   value and generate capital from the Plaintiffs' equity investments in their primary residences.

20   178.   If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded

21   the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable

22   institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied

23   on the deceptions of the Defendants in originating their loans and forbearing from exercising their rights

24   to rescind or refinance their loans.

25   179.   After entering into the transactions with each Plaintiff herein as alleged herein, the

26   Defendants sold in securities transactions the notes and deeds of trust pertaining to Plaintiffs' properties.

27   The sales:

28

- 49 -

**COMPLAINT**

     a.  Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage;

     b.  Involved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

     c.  Were for consideration greater than the actual value of the said notes and deeds of trust;

     d.  Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

     e.  Were part of schemes by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value and used the notes and mortgages as collateral for fraudulent swaps, all the while using Plaintiffs as the fodder for Defendants' fraudulent schemes.

180.   Defendants hid from Plaintiffs that Defendants were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of its underwriting guidelines, taking on ever-increasing credit risk.

181.   At the time the Defendants induced Plaintiffs to enter into mortgages, they knew their scheme would lead to a liquidity crisis and grave damage to each Plaintiff's property value and thereby result in each Plaintiff's loss of the equity such Plaintiff invested in his or her house, as well as damaging that Plaintiff's credit rating, thereby causing the Plaintiff additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint.  The Defendants concealed the foregoing from Plaintiffs, and California consumers and regulators.

182.   Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4)

- 50 -

**COMPLAINT**

1  intentionally misleading and/or partially true statements found in omissions, including in their securities

2  filings, numerous documents, advertisements and other media, statements made by their employees and

3  agents with apparent and/or actual authority and their publicly available underwriting guidelines the

4  Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably

5  relied that no material information necessary to their decisions would be withheld or incompletely,

6  inaccurately or otherwise improperly disclosed.  In so relying, the Plaintiffs were gravely damaged as

7  described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to

8  benefit therefrom at the expense of the Plaintiffs.

9      183.   The other Defendants followed Ally's directions because they are or were either

10  subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are

11  in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are

12  thereby controlled and dominated by Ally.

13      184.   At all relevant times, Defendants falsely assured the public, including Plaintiffs, that they

14  were primarily prime quality mortgage lenders who had avoided the excesses of their competitors.  To

15  the contrary, affirmative misrepresentations and material omissions permeated the Defendants' websites,

16  customer and investor materials, and required securities filings and presentations.

17      185.   Defendants concealed and did not accurately or fully disclose to any Plaintiff herein any

18  of the foregoing facts.  Defendants neither disclosed nor explained their schemes to Plaintiffs at any

19  time.  They did the foregoing with the intent to deceive Plaintiffs, the investing public, the U.S.

20  taxpayer, and California and other regulatory agencies.

21      186.   Defendants affirmatively misrepresented their underwriting processes, the value of its

22  mortgages and the fundamental nature of its business model to their investors and to Plaintiffs in their

23  press releases, annual reports and securities filings, all of which were widely distributed to the public,

24  including Plaintiffs.

25      187.   Defendants fraudulently classified their liar loans as "prime" loans.  Defendants'

26  personnel who objected to the liar loans were reprimanded or fired.

27

28

- 51 -

**COMPLAINT**

1      188.   It is precisely the previously alleged loss of value on which the Defendants now seek to

2  capitalize.  They would transfer a material portion of that wealth to themselves or those in collusion with

3  them.  This scheme includes acquiring the real property at reduced values, collecting U.S. Government

4  money for paper losses, and harvesting the future increase on the value of these artificially depressed

5  homes. Since its government guarantee to purchase troubled assets Ally has been aggressively

6  foreclosing on Plaintiffs homes.  With Government protection in its hip pocket, any losses incurred will

7  be covered through loss provisions afforded by the tax payer.

8

9

10  **<u>DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS</u>**

11

12  ***Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright***

13  ***Cash-Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own Fraud***

14  ***Discovered By Their Investors***

15

16      189.   After inducing Plaintiff Borrowers into entering dangerous loans through outright

17  deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused

18  to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good

19  faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants

20  were required to buy back loans from their investors if a material misrepresentation was discovered,

21  Defendants refused to modify loans which qualified in every regard for one, for fear of having their own

22  fraud and falsified information discovered by the investor, and having to buy back their fraudulent loans,

23  and incurring massive loss.  In other words, Defendants placed their fiscal interests ahead of borrowers

24  who desperately needed and *qualified* for the modifications, and who would face financial ruin or

25  homelessness without one.  Instead, Defendants chose to line their coffers, rather than offer assistance to

26  the very people they imperiled through their greed – assistance they were under a good faith obligation

27  to provide. Simply put, Defendants were looking out for themselves.

- 52 -

28  **COMPLAINT**

190.   Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

191.   Every Pooling and Servicing Agreement has strict Warranties and Material Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a material misrepresentation or violates the warranties given to certificate holders and the Trustee of the REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is now void due to fraud being detected on the loan.

192.   In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Ally would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

193.   When Plaintiffs are desperate for help, Ally refuses to assist them. In the event that Ally forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Ally through their processing centers find out that the income listed on the initial loan application was not correct.

194.   This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Ally instructs their employees to decline any application that contains a material misrepresentation for *fear of having to buy back the loan.*

195.   This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

- 53 -

**COMPLAINT**

196.    This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans.

197.    Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California.  Since 2010, these tactics and Defendants' other wrongful acts have finally been revealed as a result of extensive litigation and Government investigations.  .

***Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs'***
***Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else***

198.    Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

199.    In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

200.    By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

201.    At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

- 54 -

**COMPLAINT**

Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plain*tiffs*

202.      Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not limited to, the following:

     a.   failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

- 55 -

**COMPLAINT**

b.   making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

c.   failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

d.   delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs;

e.   engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

f.   omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

## DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT

203.   Continuing their chronology of greed-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into egregiously dangerous, unaffordable and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans -  with no intent of ever actually

- 56 -

## COMPLAINT

1   modifying Plaintiffs' loans for fear of having their own (Defendants') fraud discovered by their

2   investors and being forced to buy back the loan at a massive loss, but in a final coup-de-grace (3)

3   intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust,

4   in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees,

5   default fees, late fees, advance fees, attorney fees, and trustee fees.

6         204.   Defendants charged these ill-defined and ambiguous fees whose amounts were *never*

7   disclosed to Plaintiffs in any writing or contract whatsoever, unilaterally. They decided how much they

8   wanted to charge for whatever reason they wanted to charge it. And the amounts they charged were

9   tantamount to price gauging, often charging double, triple or even quadruple the fair market value for

10   these "services." Needless to say, the outrageous price markups all inured to the benefit of the

11   conspiracy of Defendants. Especially in light of the fact that Defendants did not have an ownership

12   interest in the property upon which to foreclose, these charges and fees were entirely unjustified, and

13   constitute numerous cognizable sources of restitution.

14         205.   In short, Defendants made money by initiating foreclosures, and for this very reason

15   intentionally steamrolled wrongful foreclosures over plaintiffs without having any true possessory or

16   ownership interest in the deed of trust, threatening to wrongfully dispossess Plaintiffs of their homes and

17   placing them on the streets.

18         206.   In the greed-driven world of Defendants, neither law nor ethics would be allowed to

19   stand as an obstacle in their insatiable hunt for profit.

20

21                 *Defendants Seek to Enforce Notes & Deeds of Trust*

22                       *Without Evidencing Their Ownership Interest*

23         207.   Securitizing a loan generally entails the sale of a loan to private investors, together with

24   other loans, in a "pool" of loans. Indeed, as typically executed, a securitization process may result in up

25   to three successive sales of the loan or in interests in the loan. These interests in the same loan are sold

26   in tranches that can be found in many collateralized debt obligation securities. As a result, the ultimate

27   note holders are many, disparate and unrelated entities, no one of which can lawfully enforce the note

- 57 -

28

**COMPLAINT**

1  without the participation of all the other anonymous note holders to partial interests in a single home
2  loan.
3        208.   Defendants' continue to demand payment and to foreclose and threaten to foreclose on
4  Plaintiffs, despite the facts that:

     a.   Defendants have no proof that they own the notes and deeds of trust they seek to
       enforce;

     b.   There is considerable evidence that Defendants do not own the notes and deeds of
       trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do
       not; and

     c.   Whether or not they can demonstrate ownership of the requisite notes and deeds of
       trust, Defendants lack the legal right to enforce the foregoing because they have not
       complied with disclosure requirements intended to assure mortgages are funded with
       monies obtained lawfully.

      209.   Plaintiffs believe and thereon allege that Defendants have made demand for payment on
the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of
establishing (and do not have any credible knowledge regarding) who owns the promissory notes
Defendants are purportedly servicing.   Plaintiffs believe and thereon allege that because Defendants are
not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the
various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of
trust.

## *Defendants' Improper Securitization:*
### *The Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under The Explicit Terms Of Their Own Pooling & Service Agreements*

      210.   Almost every Mortgage loan investigated which was produced by a major Banking
Institution between the years 2000 - 2008 was securitized. Securitization is the act of producing an

- 58 -

**COMPLAINT**

1   investment vehicle of Mortgage-Backed Securities ("MBS") using the Borrower's Mortgage NOTE as

2   the under-lying corpus, as collateral.

3       211.   In a typical Securitization Transaction, mortgage loans are transferred by loan

4   "Originators" to a "Sponsor." The "Sponsor", in turn, sells the mortgage loans to a "Depositor," a single

5   –purpose entity.  When the Sponsor acts in selling capacity, it is often referred to as a "Seller," as well

6   as a Sponsor.  The Depositor, in turn, deposits the loans into the securitization trust also known as a

7   "REMIC", pursuant to a Pooling and Servicing Agreement ("PSA") or similarly-named agreement.

8       212.   The parties to the Pooling and Servicing Agreement (PSA) generally are the Seller, the

9   Depositor, the "Master Servicer," which services the mortgage loans and/or monitors the servicing of the

10   mortgage loans by sub-servicers, and the "Trustee" who administers the trust that is established pursuant

11   to the PSA.

12       213.   The reason loans are pooled and placed into these loan trusts named REMIC's is due to

13   income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a

14   "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the

15   vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and

16   certificate holders. It is like an S Corp where there is no double taxation.

17       214.   Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two**

18   **years** after the set-up of the Trust due to tax implications.  You can only substitute in loans for two years

19   thereafter, if there is non-compliance with the aforementioned PSA the penalty is 100% of the face value

20   of the asset in tax penalties.

21       215.   Plaintiffs believe that their loans are illegally being substituted in and out of these loan

22   Trusts in direct violation of the PSA's in order to cure deficiencies with the Chain of Title that never

23   should have occurred to begin with. Defendants are attempting to cure these defects with the use of

24   (MERS) Mortgage Electronic Registration System.

25       216.   Moreover, Plaintiffs allege that in numerous instances, Defendants foreclosed on behalf

26   of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long**

27   **closed under the terms of their very own PSA.** In other words, it was impossible for the subject loan

- 59 -

**COMPLAINT**

1   to be placed into the trust such that the trust would have any ownership interest in the loan upon which
2   to foreclose.

3        217.    Defendants are defrauding Plaintiff's by transferring or purporting to transfer ownership
4   of these loans to entities that **can no longer accept these assigned loans**, and thus have no ownership
5   interest in the loans upon which they could foreclose. Under strict REMIC rules a loan must follow a
6   specific protocol in order to become property of the Trust.

7           a.  Originator/ Lender must endorse the Note in Blank to the Sponsor/Seller

8           b.  The Seller assigns the Note to the Depositor/Purchaser who is to insure that all of the
9               trust assets are actually deposited into the REMIC.

10          c.  The Depositor assigns all of the Notes and Deeds of Trust/Mortgages into the name of
11              the Issuing Entity.

12          d.  The Issuing Entity is the newly formed REMIC that obtains an issuer number from
13              the Securities and Exchange Commission to issue Certificates to Investors.

14          e.  The Issuing Entity hires an independent Trustee to become the Custodian of the Trust.
15              Trustee's job is to supervise the activities of the Trust and to insure that the
16              Certificate Holders/Investors **"True Owner's"** of the loans are paid based on the
17              Certificate grades they purchased.

18          f.  The Trustee hires a Master Servicer and Sub-Servicers to collect mortgage payments
19              and service the loans on behalf of the Trust.

20          g.  In the event of a foreclosure action the REMIC Trustee must follow proper
21              foreclosure procedures as laid out in the Pooling and Servicing Agreement.

22       218.    It is standard in the securitization industry and the secondary markets to endorse a note to
23  blank. Most often times the pool servicing agreement requires the Depositor to endorse the Note to
24  Blank, in other words it is not endorsed to a person or entity, it's endorsed in blank making the Note a
25  bear or bear instrument making it possible for the holder of that instrument to Deposit it into the Trust as
26  required by the pool agreement. However, with this endorsement the pooling and servicing agreement
27  requires that the Depositor transfer the Note to the Trustee for the benefit of the certificate holders.

- 60 -

**COMPLAINT**

1      219.    A "Custodian" is sometimes a party to the PSA and sometimes enters into a separate

2    Custodial Agreement with the Trustee or the Trustee can act as both if so designated in the PSA.

3      220.    Pursuant to the Custodial agreement, the Custodian maintains possession of the loan files

4    on behalf of the Trustee.

5      221.    An "Underwriter" typically enters into an Underwriting Agreement with the Depositor

6    pursuant to which the Underwriter commits to purchase certain of the trust certificates and/or notes

7    issued by the trust.  In turn, the trust certificates and/or notes are sold to investors by the Underwriter (or

8    Underwriters) pursuant to a Registration Statement or Prospectus filed with the Securities and Exchange

9    Commission ("SEC").

10      222.    When the transaction is complete, the Trust files a Form 8-K with the SEC.  The form is

11    accompanied by the documents involved in the securitization transaction.

12      223.    Trust certificates are frequently issued in different classes.  The different classes are

13    associated with different payment terms, and different levels of risk.  One loan can be placed in multiple

14    classes of securities; these different classes of trust certificates are called "Tranches". The terms,

15    including payment schedule, distribution priority, and allocation of losses, and the level of risk

16    attributable to each class of certificates, or tranche, are defined in the PSA and related exhibits, and in

17    the Prospectus and Prospectus Supplements.

18      224.    When a loan is placed into a Tranche there can be more than one owner of the security

19    since the loan has been chopped up into smaller pieces and listed as security in different classes of

20    certificates based on risk.

21      225.    The relative risk associated with any class, or tranche, of the trust certificates may be set

22    by various devices, including credit enhancements, the subordination of lower level tranches through an

23    agreement to absorb losses first, the over-collateralization of loan pools in excess of the aggregate

24    amount of the trust certificates, or the creation of an excess spread fund to cover the difference between

25    the interest collected from the pooled mortgage notes and the amounts owed to investors who purchase

26    the trust certificates.

27

28

**COMPLAINT**

EXHIBIT A
069

226.   Subordinating the right of certain of the trust certificates to receive cash flow from the pooled mortgage until senior trust certificates have been paid, or allocating the cash flow from the pooled mortgages until senior certificates have been paid, or allocating the cash flow from the pooled mortgages to different levels of trust certificates may be employed to create a tiered structure known as a **"Waterfall."**

227.   Losses from mortgage defaults, delinquencies, or other factors may be allocated in reverse seniority, with the junior tranches incurring losses first until their interests are reduced to zero. Each class of trust certificates or tranche may have a credit rating issued by one or more nationally recognized statistical rating organizations who rate the likelihood of payment of interest and principal owed to the tranche, based on their internal projections of expected losses from the loan pool.

228.   Securitization transactions involving government sponsored entities such as Fannie Mae and Freddie Mac follow the same general pattern involving the pooling of loans and sale of securities to investors, although the terminology and intermediate entities may be different.

229.   In simple terms, in a securitization transaction, the loan is made by the "originator," and then sold into the market. Ownership of the loan is transferred to a trust. Certain files, including the original note and original deed of trust are maintained by a custodian or the trustee. The loan is serviced by the servicer, who collects the payments, keeps the payment history, and initiates (but typically does not conduct) foreclosure sales. Participants in the trust earn income, and absorb losses, according to the terms of the trust and associated contracts.

230.   Other mortgage notes are owned by the issuing banks and are held in inventory for their own investment purposes.

231.   The following diagram illustrates the various parties involved in the typical securitization transaction, and also evidences custody and ownership of the underlying mortgage note.

- 62 -

**COMPLAINT**

FORECLOSURE IN CALIFORNIA │ BROOKSTONE LAW, PC

# Appendix A - Understanding Securitization

It is important to have a general familiarity with mortgage securitization in order to understand the foreclosure process. Securitization involves a series of conveyances of the note evidencing the residential loan and assignment of the mortgage or trust deed securing it. Therefore, chain of title and beneficial interest issues frequently turn on the securitization trajectories.

*Securitization* is the process pooling loans into "mortgage-backed securities" or "MBS" for sale to investors. MBS is an investment instrument backed by an undivided interest in a pool of mortgages or trust deeds. Income from the underlying mortgages is used to pay interest and principal on the securities. Figure A below is a simplified schematic depicting the general securitization process and some of the parties involved.

**Figure A - Securitization Schematic**



The process begins with *Originators*, which are the lenders (such as banks or finance companies) that initially make the loans to homeowners. *Sponsor/Sellers* (or "sponsors") purchase these loans from one or more Originators to form the pool of assets to be securitized. (Most large financial institutions are both Originators and Sponsor/Sellers.)   A *Depositor* creates a *Securitization Trust*, a special-purpose entity, for the securitized transaction. The depositor acquires the pooled assets from the Sponsor/Seller and in turn deposits them into the Securitization Trust.   An *Issuer* acquires the Securitization Trust and issues certificates to eventually be sold to investors.

BROOKSTONE LAW, PC "SECURITIZATION CHART"©

232.   Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

233.   As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

### *Understanding MERS – And Its Role In Defendants' Wrongful Foreclosure Process*

234.   MERS operates an electronic registry designed to track servicing rights and the ownership of mortgages. MERS is sometimes named as the "nominee" for lenders, and at other times MERS is named as the "beneficiary" of the deed of trust on behalf of unknown persons. When a loan is transferred among MERS members, MERS purports to simplify the process by avoiding the requirement to re-record liens and pay county recorder filing fees.

235.   For many of the Plaintiffs herein, MERS claims to be the owner of the security interest indicated by the mortgages transferred by lenders, investors and their loan servicers in the county land records. MERS claims its process eliminates the need to file assignments in the county land records which lowers costs for lenders and consumers by reducing county recording revenues from real estate transfers and provides a central source of information and tracking for mortgage loans.

236.   Based upon published reports, including MERS' website, Plaintiffs believe and hereon allege, MERS does not: (1) take applications for, underwrite or negotiate mortgage loans; (2) make or

- 63 -

**COMPLAINT**

1   originate mortgage loans to consumers; (3) extend credit to consumers; (4) service mortgage loans; or

2   (5) invest in mortgage loans.

3        237.    MERS is used by Defendants to facilitate the unlawful transfers of mortgages, unlawful

4   pooling of mortgages and the injection into the United States banking industry of unsourced (i.e.,

5   unknown) funds, including, without limitation, improper off-shore funds.  Plaintiffs are informed and

6   thereon believe and allege that MERS has been listed as beneficial owner of more than half the

7   mortgages in the United States.  MERS is improperly listed as beneficial owner of many of Plaintiffs'

8   mortgages.

9        238.    MERS states in their Quality Assurance and Procedures Manual which protocol to follow

10   on active MERS loans and which protocol to follow for non-MERS member loans. Prior to a MERS

11   member bringing any type of foreclosure action they must prepare and assignment and give it to the

12   Servicer for it to be recorded before first legal action is brought including the filing of Notice of

13   Defaults.

14        239.    If the loan is deactivated from the MERS system, MERS must prepare and record an

15   assignment transferring the beneficial interests of the MERS member loan to the beneficiary and must

16   insure that this assignment is recorded within fourteen calendar days of the Deactivation Date.

17        240.    At all times MERS must disclose who the investor or beneficiary is of the mortgage note

18   in accordance with 15 USC Section 1641 (f)(2), yet when loans are searched in their database they state

19   that the investor has chosen not to display that information or they list the servicer as the investor on the

20   loan. By hiding the true beneficiary they are preventing the Plaintiffs from contacting or negotiating loan

21   modifications or short sales with the "True Party in Interest".

22        241.    On April 13, 2011, the Federal Reserve Board of Governors, the Comptroller of the

23   Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the Federal

24   Housing Finance Agency found "certain deficiencies and unsafe or unsound practices by MERS and

25   MERSCORP that present financial, operational, compliance, legal and reputational risks." As a result,

26   the various agencies entered into a Consent Order requiring those practices be audited and corrected.

27

- 64 -

28

**COMPLAINT**

242.   In 2001, Congress found that "money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks." Congress specifically found that "money launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism..." The Defendants in this lawsuit have in this manner subverted financial mechanisms with the intent, or at least the result and callous disregard, of providing such a covering for many illegal activities.

### *The Aftermath of Defendants' Wrongful Foreclosures*

243.   To add further insult to injury, Defendants, knowing of this massive fraud, and sought to swoop in like the Civil War carpetbaggers and profiteer from the carnage that they had wreaked on Plaintiffs.

244.   With the proceeds of TARP funds and a voraciousness that has already been chastised by numerous courts, Defendants then sought to obliterate the last vestiges of value held by Plaintiffs, and proceeded to flip distressed assets for a profit.

245.   Defendants' other improper acts since 2008 are numerous, including but not limited to: (1) issuing Notices of Default to some Plaintiffs in violation of Cal. Civil Code §2923.5; (2) issuing Notices of Defaults, and initiating foreclosure on behalf of those with no beneficial interest in the note or deed of trust , (3) conducting the unauthorized sale of Plaintiff's property by a trustee who was never properly appointed or substituted as trustee (4) misrepresenting their intention to arrange loan modifications for many Plaintiffs, while in fact creating abusive roadblocks to deprive Plaintiffs of their rights; and (5) failing to respond to most Plaintiffs' communications while often erecting barriers to make it difficult for the Plaintiffs to communicate with them.

246.   Defendants continue to demand payment and to threaten to foreclose on Plaintiffs, despite the facts that: (1) Defendants have no proof that they own the notes and deeds of trust they seek to enforce; (2) there is considerable evidence that Defendants *do not* own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and (3) whether or

- 65 -

**COMPLAINT**

1    not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal

2    right to enforce the foregoing because they have not complied with required disclosure requirements

3    intended to assure that mortgages are funded with monies obtained lawfully in addition to California's

4    non-judicial foreclosure statutes codified at Cal.Civ.Code 2924 et seq., with which, it has been

5    repeatedly affirmed by California courts, *"strict compliance"* is required.

6        247.    As a proximate and foreseeable result of the Defendants' sale of the notes and deeds of

7    trust regarding Plaintiffs' properties and others similarly situated for more than the actual value of such

8    instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in

9    accordance with their indentures.  Further, it was only a matter of time before Defendants' fraudulent

10    offshore swaps were uncovered.  The unraveling of the Defendants' fraudulent scheme has materially

11    depressed the price of real estate in many parts of California, particularly including the real estate owned

12    by Plaintiffs.

13        248.    Defendants have admitted in their various securities filings that they sold Plaintiffs' notes

14    and mortgages.  There is no evidence that Defendants have re-acquired Plaintiffs' notes or deeds of trust.

15    Accordingly, their claims of subsequent ownership appear to be specious.

16        249.    Plaintiffs believe and thereon allege that Defendants have made demand for payment on

17    the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants were incapable of

18    establishing (and did not have any credible knowledge regarding) who owns the promissory notes

19    Defendants were purportedly servicing, and that these acts are continuing.  Because Defendants are not,

20    and were not at the relevant times, the holders of Plaintiffs' notes and deeds of trust and are not, and

21    were not at the relevant times, operating under a valid power from the current holders of the notes and

22    deeds of trust, Defendants are not and were not at the relevant times allowed legally to enforce the notes

23    or deeds of trust.  Defendants' attempts to enforce these notes were nothing but a sham and a fraud upon

24    the Plaintiffs, the public, and the courts.

25    //

26    //

27

28

- 66 -

**COMPLAINT**

## DEFENDANTS' VIOLATION OF NUMEROUS OTHER LAWS

### *Defendants' Pervasive Scheme Of Fraud & Deception*

250.   Under California Civil Code § 1709 it is unlawful to willfully deceive another "with intent to induce him to alter his position to his injury or risk."

251.   Under California Civil Code § 1710, it a "deceit" to do any one or more of the following: (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) a promise, made without any intention of performing it.

252.   Under California Civil Code § 1572, the party to a contract further engages in fraud by committing "any other act fitted to deceive."

253.   At the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, Defendants were bound and obligated to fully and accurately disclose the following and did not do so:

   a.   Who the true lender and mortgagee were.

   b.   That to induce a Plaintiff to enter into a mortgage, the Defendants disregarded their underwriting requirements, thereby causing Plaintiff to falsely believe that Plaintiff was financially capable of performing Plaintiff's obligations under the mortgage, when the Defendants knew that was untrue.

   c.   That Defendants not only had the right to securitize and sell Plaintiff's mortgage to third-party investors, but that they specifically planned and intended to do so as to virtually all mortgages at highly-inflated and unsustainable values.

   d.   That Defendant's intended to use Plaintiffs notes and mortgages as security for fraudulent swap transactions.

- 67 -

**COMPLAINT**

e.   That as to the intended sales:

    i.   The sales would include sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS, which according to its website, was created by mortgage banking industry participants to be only a front or nominee to "streamline" the mortgage re-sale and securitization process;

    ii.   Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage would not be disclosed to investors to whom the note and/or mortgage would be sold or used as collateral;

    iii.   Defendants intended to sell the note and mortgage together with other notes and mortgages as to which they also intended not to disclose the true financial condition of the borrowers or the true value of their homes, notes or mortgages;

    iv.   The consideration to be sought from investors would be greater than the actual value of the said notes and deeds of trust; and

    v.   The consideration to be sought from investors would be greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon.

f.   That the notes and mortgages would thereby be used as part of a scheme by which the Defendants would bilk investors by selling collateralized mortgage pools at an inflated value and/or by entering into swaps at inflated value.

g.   That, at the time they did the foregoing, the Defendants knew the foregoing would lead to a liquidity crisis and the likely collapse of Defendants;

h.   That the Defendants also knew the foregoing would lead to grave damage to each Plaintiff's property value and thereby result in Plaintiff's loss of the equity Plaintiff invested in his house, as well as damaging Plaintiff's credit rating and resulting in other costs and damages to Plaintiff, thereby causing Plaintiff additional severe

- 68 -

**COMPLAINT**

1    financial damage; and

2    i.   That the Defendants knew at the time of making each loan, but did not disclose to

3         Plaintiffs, that entire communities would become "ghost-town-foreclosure-

4         communities" after a domino effect of foreclosures hit them.

5    j.   That the Defendants did not have documents competent to establish that they were

6         holders in due course of the notes or deeds of trust, or otherwise operating under a

7         valid power of attorney with respect thereto to support the right to enforce the notes

8         and deeds of trust against Plaintiffs property.

9    k.   That the Defendants did not properly source their funds, or report the source of their

10        funds in compliance with all requirements.

11       254.   When property values started falling – just as Defendants knew would occur –

12   Defendants could no longer continue the pretense, concealment and affirmative misrepresentations.

13   Plaintiffs through their losses, and then also the ultimate banker, the U.S. taxpayer, have footed the bill

14   through TARP and other programs.

15       255.   Further, in violation of their own underwriting guidelines, Defendants covertly offered

16   Plaintiffs and others loans at a loan-to-value ratio that was unsustainable and without income

17   verification.  The Defendants knew, but concealed from Plaintiffs that they knew, Plaintiffs would soon

18   be unable to afford the loans once introductory discount interest rates ended, and variable interest and

19   balloon payments kicked in.

20       256.   The Defendants knew that when interest payments increased and balloon payments

21   became due, if not before, Plaintiffs and others would begin defaulting on their mortgages and would

22   suffer grievous losses from mortgages for which they were not qualified.

23       257.   The Defendants knew that the scale of the lending – based on inflated property values,

24   without income verification and in violation of numerous other Defendants underwriting guidelines –

25   would lead to widespread declines in property values, thereby putting Plaintiffs and others into extremes

26   through which they would lose the equity invested in their homes and have no means of refinancing or

27   selling, other than at a complete loss.  That is precisely what happened to Plaintiffs herein.

- 69 -

**COMPLAINT**

28